Filed 6/27/13

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S080054 |
| v. | ) | |
| | ) | |
| DANIEL ANDREW LINTON, | ) | |
| | ) | Riverside County |
| Defendant and Appellant. | ) | Super. Ct. No. CR60158 |
| _____ | ) | |

A jury convicted defendant Daniel Andrew Linton of the 1994 first degree murder of 12-year-old Melissa Middleton (Pen. Code, § 187)[1] and found true the special circumstance allegations that the murder was committed during the commission of a first degree burglary, a forcible lewd act with a child under the age of 14 years, and the commission or attempted commission of rape (§ 190.2, former subd. (a)(17)(iii), (v), (vii), added by initiative, Gen. Elec. (Nov. 7, 1978), Prop. 7, now subd. (a)(17)(C), (E), (G)). The jury also convicted defendant of three offenses relating to a prior assault on Melissa — residential burglary (§ 459), attempted rape (§§ 664/261, subd. (a)), and a forcible lewd act on a child under the age of 14 years (§ 288, subd. (b)). The jury returned a verdict of death for Melissa's murder.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

1

The trial court denied defendant's motion for new trial and his motion to modify the verdict. The trial court sentenced defendant to death. The court also imposed on defendant a determinate sentence of six years in prison for his conviction of a forcible lewd act on a child under the age of 14 and a concurrent term of four years for his conviction of attempted rape. The trial court imposed, but stayed pursuant to section 654, an 18-month sentence for defendant's conviction of burglary. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

## I. FACTS

### A. Guilt phase evidence

At trial it was undisputed that defendant strangled and killed 12-year-old Melissa Middleton. The defense theory was that defendant did so as a result of a panic attack, which was consistent with his cognitive psychological functioning, and as a result defendant lacked the specific intent necessary for the charged murder. Contending defendant was coerced into false admissions and confessions by his interrogators, the defense disputed the special circumstance allegations that defendant murdered Melissa during the commission of a burglary, a lewd act on a child or attempted rape, as well as the offenses charged in connection with the alleged prior assault involving Melissa.

#### 1. The prosecution's case-in-chief

##### a. Background

In the fall of 1994, Linda and Robert Middleton lived with their 12-year-old daughter Melissa in a two-story home in San Jacinto, California.[2] Carl and Jean

---

[2] References hereafter to the Middletons are to Linda and Robert Middleton together. When we refer to one of them individually, we will use their first names.

2

Linton lived next door with their two children, 20-year-old defendant Daniel Linton and eight-year-old Stacey. The two families had been next door neighbors for about seven years and their daughters were close friends.

The Middletons hired defendant to take care of their pets while they were away on vacation. After their last family vacation in April 1994, the Middletons forgot to retrieve from defendant the keys they had given him for their house. Defendant did not, however, have permission to be in the Middleton house anytime after their vacation.

### b. Prior attack: late September – early October 1994

Around 2:00 a.m. one night in late September or early October 1994, Melissa came into her parents' bedroom upset and crying. Melissa told her parents that a man had been on top of her in her bedroom, choking her with his hands. Melissa told them she did not know what the man looked like.

While Linda comforted Melissa, Robert went to check the house. The doors were locked and there were no signs of a break-in. He walked around the neighborhood, looking for anything unusual. As Robert passed the Linton house, he noticed a light was on and he saw through a window Joseph Montero working on a computer. Montero was a friend of defendant's who lived with the Lintons for a month in the fall of 1994. Robert spoke with Montero and told him that Melissa thought someone had been in the Middleton house. Montero told Robert he had not seen anyone. According to Montero, defendant was not home when Montero spoke with Robert. Defendant returned home approximately 15 to 20 minutes later, out of breath, and looking frightened.

Melissa had already fallen back asleep by the time Robert returned to their home. Linda and Robert discussed the incident and concluded Melissa must have

3

had a nightmare.  The next morning Melissa denied that it was a nightmare and said the man had been nude.

Linda believed this incident occurred about two months prior to November 29, 1994.  Robert also believed the attack occurred about that time, but in any event, he was certain there was only one such prior incident.

### c.  *The death of Melissa on November 29, 1994*

Melissa was sick and stayed home from school on November 29, 1994.  Linda told Melissa to stay in bed, sleep, and take her medicine.  Linda locked the front door and left for work.  Robert had already left.

Around noon, Linda telephoned Melissa to check on her.  There was no answer.  This worried Linda, but she concluded Melissa was probably sleeping and did not hear the phone.

Linda returned home from work around mid-afternoon, unlocked the door, and called for Melissa.  There was no response, but everything looked normal.  Linda went upstairs.  Melissa was not in her bedroom.  When Linda went to the master bedroom, she saw Melissa sitting on the floor at the foot of the bed with her legs crossed, her "arms kind of out," and her head to one side.  Melissa was wearing shorts, one sock, and the same shirt that she had been wearing that morning.  Melissa's shorts were unbuttoned and unzipped.  Linda called Melissa's name a couple of times, touched her, and realized she was dead.  After an unsuccessful resuscitation attempt, Linda ran to the home of a neighbor, asked for help, and called 911.

San Jacinto Police Detective Michael Lynn arrived at the Middleton home a short time later.  He found no signs of forced entry into the house and no indication that the home had been burglarized.  Lynn went up to the master bedroom, where Melissa had been placed on the floor.  He observed red bruise

4

lines on Melissa's neck, including a red line leading from the middle of her throat up to behind her right earlobe area. Believing the injuries were suspicious, Lynn declared the area a homicide crime scene. Lynn collected a pair of stereo headphones with a broken cord, which was located near Melissa at the bottom of the bed. Lynn believed the cord could have been used to cause the injury on Melissa's neck.

Dr. Joseph Choi, a forensic pathologist working for the coroner's office, subsequently performed an autopsy of Melissa. He determined that Melissa died of asphyxiation due to strangulation. Melissa's body had signs of both ligature and manual strangulation. Choi opined that the linear abrasion on Melissa's neck could have been caused by a cable, cord, or headphone wire. Melissa's injuries were consistent with someone pulling on the ligature from behind, not someone putting the ligature around her neck, crossing it in front and pulling it. Alternatively, the linear marks on Melissa's neck could have resulted from a cord placed around Melissa's neck if her hair was between the cord and her neck and if the ligature was pulled from one side. In addition to the linear abrasion, Choi found a large bruise on Melissa's neck that could have been caused by a thumb or finger. Melissa also had signs of hemorrhaging that were consistent with strangulation.

Swabs from Melissa's mouth, anus and vagina tested negative for sperm, and Choi found no injuries or abnormalities on her genitalia. The DNA profile found on two fragments of fingernail clippings from Melissa's left hand was consistent with defendant's profile. The DNA could have come from Melissa having scratched the defendant.

5

### d.  Defendant's statements to police

Shortly after 4:30 p.m. on November 29, Detective Glenn Stotz began to canvas neighbors regarding Melissa's death.  His first stop was the Linton home, where defendant answered the door.  Stotz introduced himself and asked defendant if he had heard what happened next door.  Defendant indicated he had already heard Melissa had been killed.  Defendant told Stotz that he had been home all day, but he did not see or hear anything out of the ordinary.  He said he did not know Melissa well, although she was a good friend of defendant's sister.  Defendant asked Stotz how Melissa was killed and Stotz told him that it appeared she was choked to death.  Stotz did not provide any further information.

After canvassing other residences, Detective Stotz went back with Detective Lynn to the Linton residence.  Defendant and his sister Stacey answered the door.  Defendant had changed his clothes.  Stotz asked defendant to confirm that he did not know Melissa very well.  Defendant responded that he hardly knew her.  Stacey interjected, "Uh-huh.  You used to fight with her all the time."  Defendant looked at Stacey and, according to the detectives, he appeared to be "shocked" and "appalled."  Stotz then spoke with defendant alone.

Defendant continued to claim he did not know Melissa well.  Detective Stotz asked defendant if he knew anything about an incident in which Melissa had told her parents that she had been attacked in her room in the middle of the night.  Defendant initially denied any knowledge of the previous assault, but later told Stotz about an occasion when two or three weeks earlier he woke up in his front yard around midnight wearing jeans and underwear, but no shirt or socks.  Defendant thought he might have been sleepwalking.  Stotz asked to look at defendant's hands.  When defendant held out his hands, Stotz noticed defendant had scratch and gouge marks on his lower right forearm.  He was visibly nervous.  His arms and hands were shaking and his palms were extremely sweaty.

6

Defendant claimed he received the marks earlier in the day when playing with his cat.

In the evening a few hours later, Detective Stotz returned to the Linton home, accompanied by Deputy District Attorney William Mitchell. Defendant agreed to speak with them and they went back to defendant's bedroom.

Defendant spoke with Stotz and Mitchell for about a half-hour.[3] Defendant claimed he was at home all morning and that he did not see Melissa that day. He had not been to the Middleton home since he last took care of their animals about three months earlier, and he had returned their keys at that time. When asked if he heard what happened to Melissa that day, defendant said that he heard she had been strangled with a cord and that she was found dead on the floor in her parent's room. Stotz had not told defendant these details. Stotz asked defendant if he had talked to anyone other than Stotz about Melissa's death. Defendant said he had not. Mitchell and Stotz asked defendant if he would agree to speak with investigators the next day and defendant agreed.

Stotz telephoned defendant the next morning and defendant again agreed to speak with investigators. Detectives Stotz and Lynn picked defendant up from his home. During the drive to the police station, defendant said to the officers, "I'm sorry I wasted your time. I wanted to turn myself in last night, but I couldn't do it in front of my parents." Defendant also said, "I wasn't sure I could admit it." Defendant was crying and shaking. He appeared remorseful and sad. The officers asked him if he was willing to go to the office for a formal interview and he said "Yeah. I'll tell you everything."

---

[3] Stotz used a microcassette tape recorder given to him by Detective Lynn to record the interview of defendant in his bedroom without telling defendant that he was doing so. The tape was not played for the jury.

At the police station, defendant was advised of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) and agreed to answer questions.[4] He gave a simplified account of the killing. He told Stotz that he went to the Middleton house about 10:00 or 11:00 the previous morning and noticed the front door was unlocked. He said he did not know why he went over to the house and he denied he had a key for the house. He said he had given the key back two months earlier after he watched the family's pets. Defendant said that when he went inside the house, he heard a noise and thought Linda was home. He went upstairs and found Melissa instead. Melissa told defendant she was going to call the police and as he was getting ready to leave, she started screaming. Defendant grabbed her by the throat and she stopped screaming. He did not really notice "how far [he] had gone until it was, until it was too late."

After a long pause waiting for defendant to add anything further, Detective Stotz asked defendant if it would be easier for defendant if Stotz asked some questions. Defendant said, "Yeah." Stotz proceeded to elicit additional details about the murder and the prior assault by further questioning of defendant.

Defendant said when Melissa started screaming, she ran into her parents' room to call the police. Stotz asked defendant if he had any idea why Melissa started screaming as soon as she saw him and wondered whether Melissa was afraid of defendant. Defendant agreed that she might have been afraid of him because of the incident that happened a couple of weeks earlier. Defendant said that after Melissa started screaming, he followed her into her parents' bedroom, pushed her onto the bed so that she could not reach the telephone, grabbed her

---

[4] The audiotape of defendant's interview at the police station was played for the jury.

8

throat with both hands and started choking her. As Melissa struggled and gasped for air, defendant grabbed the headphones that were on the nightstand by the bed. He did not recall how he put the cord around Melissa's neck, although he was certain he was standing in front of her. He thought he may have put it around the back of her neck, crisscrossed it in front of her throat, and pulled. After a few seconds, the cord broke and defendant resumed choking Melissa with his hands. After she fell off the foot of the bed and was no longer "awake," defendant sat her up against the bed. He then picked up a rag and wiped the headphone cord, the stair rail, and the doorknobs on the front door to get rid of fingerprints.

Stotz returned several times to the question of why defendant went over to the Middleton house. At first defendant said he went into the house just to look around. Later he admitted going into the home to look for money. Defendant said he needed money because someone had taken $100 from him. He unsuccessfully searched the downstairs area of the Middleton home before going upstairs. Defendant said he had also gone to the Middleton house in the prior incident because he needed money then as well.

Defendant repeatedly denied any sexual relationship with or sexual interest in Melissa as a motive for going over to the house. He specifically denied raping Melissa. Defendant denied trying to have sex with Melissa during the incident that he thought was two weeks prior to the killing, not two months earlier. He said he was half asleep at that time, although he did remember going up to Melissa's room and then choking her when it seemed like she was going to wake her parents. Asked to explain how Melissa's shorts came to be unbuttoned and unzipped on the day of her death, defendant initially suggested she might have been changing them and said that if he had noticed her zipper was down, he would have zipped it up. Later he suggested her pants may have been tight and that was why the zipper came undone. At another point, he speculated that she may have needed to use the

9

toilet and that she saw him as she was on her way to or from the bathroom. Eventually, defendant admitted he had unzipped Melissa's shorts during the struggle and said the thought crossed his mind to have sex with her, but he claimed it was more to scare her so she would not say anything. Finally, during an afternoon interview with Detectives Stotz and Fred Rodriguez, defendant admitted he tried to rape Melissa during the previous incident "whenever it was." He also admitted that on the day of the killing, the thought crossed his mind to rape Melissa, but after he undid her zipper, he changed his mind.

Defendant said that after the killing, he returned home, took a shower, changed and washed his clothes. He also threw away the Middletons' keys, which he ultimately admitted to using in order to gain entry into the Middleton house on both the previous day and on the prior occasion. He told Stotz they were still in the trash can at his house.

During a subsequent search of defendant's home, Stotz found the Middletons' house keys, one of Melissa's rings, and a pair of Melissa's soiled underpants in the kitchen trash can. Melissa's DNA was found on the crotch of the underpants. Defendant's DNA was found in sperm and semen on the front and back of the underpants. There was no semen on the clothes Melissa was wearing when she was murdered.

> 2. *The defense case*

Defendant did not testify. To challenge the special circumstance allegations and the charges relating to the previous incident, the defense presented the testimony of several experts as well as a neighbor and the deputy district attorney who questioned defendant at the police station.

Dr. Werner Spitz, a forensic pathologist, reviewed autopsy photographs of Melissa and from them concluded Melissa was not strangled to death in the

10

manner described by the prosecution. Spitz believed the marks on Melissa's neck were consistent with someone grabbing and twisting Melissa's shirt around her neck, thereby cutting off the blood flow to her brain. Spitz attributed the large bruise on her neck to a knuckle going into her neck as part of this twisting process. He theorized that Melissa may have lost consciousness and died within 20 to 30 seconds.

The defense called Deputy District Attorney John Chessell and questioned him regarding his participation with Detective Stotz in defendant's interrogation at the police station. Chessell denied that he tried to plant in defendant's mind the answers the prosecution wanted. Chessell admitted that, contrary to some of his previous testimony, there may have been some brief conversation with defendant that was not tape-recorded because it occurred while the cassette was being turned over.

The defense called Dr. Craig Rath, a licensed clinical psychologist, to testify regarding his interview and psychological testing of defendant at the police station on November 30, 1994. Rath interviewed and tested defendant that day at the request of the prosecution for the purpose of determining defendant's mental functioning and mental status.[5] According to Rath, defendant was generally alert and answered virtually all of Rath's questions, although Rath found defendant's affect to be flat. Rath and defendant discussed some of defendant's medical, school, and family history. They discussed some of the details regarding defendant's killing of Melissa and the previous incident occurring at her house. Rath found no indication defendant was insane, had brain damage, suffered any deficits in cognitive function or had any major mental illness. Defendant scored

---

[5] An audiotape of Rath's interview of defendant was played for the jury.

high on social introversion and depression on the Minnesota Multiphasic Personality Inventory (MMPI) test administered by Rath. Defendant's MMPI responses indicated he had low energy, particularly for a 20-year-old man. His MMPI score was statistically elevated on the psychopathic deviant scale, but defendant did not meet the diagnostic criteria for a sociopath.

Melody Morris, a nurse living next door to the Lintons, testified that defendant was socially awkward and that she suspected defendant was physically abused by his father.

Dr. Cecil Whiting, a licensed psychologist, performed a psychological evaluation of defendant in 1997, three years after Melissa's death. Whiting spent 15 hours with defendant during six meetings and administered several psychological tests to him, including a version of the MMPI and the Luria-Nebraska Neuropsychological Battery. Whiting listened to defendant's interviews with the detectives and Dr. Rath, reviewed Rath's written report and defendant's school and medical records, and spoke to some of defendant's family members.

Dr. Whiting was critical of Dr. Rath's interview methods and results, although he felt Rath's testing supported his own diagnosis. Whiting concluded defendant had neuropsychological impairment and suffered from depression, social phobia (manic panic disorder with manic attacks based on right temporal lobe damage), and avoidant personality disorder featuring social phobia and panic attacks. The most prominent part of defendant's personality was self-isolation. According to Whiting, defendant's social introversion and low level of energy may have lowered his ability to withstand the pressures of interrogation and increased his suggestibility.

Dr. Whiting opined defendant's statements during his interviews with police about his loss of perception of time and fear during the killing of Melissa, as well as his inability to fully recall the earlier incident at the Middleton home,

12

were consistent with his suffering a panic attack during both the killing and the prior incident.**6** Whiting testified that a person experiencing a panic attack rarely can describe everything that was happening at the time. Such a person may fill in the blank spaces of his or her memory with a description of what logically should have happened.

### 3. *The prosecution's rebuttal case*

Linda Middleton was recalled and testified that the button and zipper on Melissa's shorts were in working order when she last saw them and that Melissa did not have the habit of wearing clothes in disrepair.

Robert Middleton was recalled and testified that the cord of his headphones was not damaged before Melissa's death.

---

**6** Dr. Whiting defined a panic attack as a discrete period of intense fear or discomfort during which four or more of the following symptoms develop abruptly and reach a peak within 10 minutes: (1) palpitations, pounding heart or accelerated heart rate; (2) sweating; (3) trembling or shaking; (4) sensations of shortness of breath or smothering; (5) feeling of choking; (6) chest pain or discomfort; (7) nausea or abdominal distress; (8) feeling of dizziness, being unsteady, lightheaded or faint; (9) derealization or depersonalization (being detached from oneself); (10) fear of losing control or going crazy; (11) fear of dying; (12) paresthesia (numbness or a tingling sensation); and (13) chills or hot flashes. Whiting acknowledged that Dr. Rath asked defendant during his interview on the day after the killing whether defendant had ever experienced what Rath described as "anxiety attacks," listing trouble with breathing, heart pounding and sweating as typical symptoms. Defendant responded that previously he "had a couple of those, but not as hard, not that bad." Defendant guessed the last time something like that happened to him had been three months earlier. Whiting criticized Rath, however, for not asking defendant followup questions after defendant described himself as being scared a number of times during the events leading to Melissa's death, inferentially suggesting such questions would have revealed defendant was experiencing symptoms of a panic attack at that time.

13

**B. Penalty phase evidence**

*1. The prosecution's case*

Both of Melissa's parents, Linda and Robert Middleton, testified about Melissa's sweet and friendly personality, musical talent, and interests in horseback riding, bicycling, Girl Scouts, camping, and dancing. They testified about how hard her death was on them, their son (Melissa's older brother), and Melissa's grandparents. They testified to a number of fond memories of Melissa and their regret that they will never see her graduate, marry, or become a teacher. They no longer celebrate Thanksgiving or Christmas. Robert lives with images of Melissa being hurt and pleading for her life. He feels guilty about not protecting her and thinking that the prior assault had been a nightmare. The Middletons sought psychiatric assistance for a year after the murder and tried different support groups until they found a group of parents of murdered children with whom they felt comfortable. Their son moved to Washington State and said he would never be able to live in California again.

Two of Melissa's close school friends testified concerning the impact of her murder on them. They testified that Melissa was a very loving and cheerful person who always tried to make others feel better. They gave examples of the fun they had together. They testified to the shock and fear they felt when they learned of her murder, and said they still miss her.

The Christmas parade at Melissa's middle school was dedicated to Melissa after her death. The school also recognized her with a memorial plaque beneath the school flagpole and an empty chair at graduation, on which students placed flowers.

The prosecution presented 13 still photographs that showed Melissa at various stages of her life, the memorial plaque at her school, and the empty chair at graduation.

14

## 2. *The defense case*

The defense presented the testimony of the two school psychologists who evaluated defendant when he was in kindergarten and when he was in third grade. Both described defendant's behavior and opined that defendant was a significantly emotionally disturbed child. They testified that children with such problems identified so early in life have a high probability of continuing to experience them into adulthood.

Defendant was in a special education class for emotionally disturbed children for both second and third grade. His teacher testified to defendant's withdrawn nature and social isolation. Defendant was one of the more disturbed children — in the top five — that she had encountered in her career. She related an incident of suspected physical abuse of defendant by his father.

Although defendant was subsequently transferred to a private school and then to a regular classroom in public school, defendant finished high school in a continuation high school because he fell behind in credits. The lead teacher at the continuation high school testified that defendant continued to be a loner, his only friend being Montero. When defendant graduated, he was unprepared to go on to a four-year college.

The defense established, through the testimony of defendant's father and other family members, that (a) from an early age defendant was subjected to harsh and inappropriate physical discipline from his father, who had a quick and fiery temper, (b) defendant was very shy, submissive and fearful, (c) although defendant's parents treated their daughter Stacey preferentially, defendant did not act resentfully of their favoritism, and (d) defendant was not aggressive or violent, but kind and loving. Defendant's grandmother testified that defendant had matured since his incarceration. She stated that he felt dreadful about Melissa.

15

The leader of a live action role-playing game club testified regarding defendant's participation in the club's weekly games for several years prior to his arrest. Defendant was shy and lacked confidence. He was a follower, who did not handle pressure well. Defendant could be talked into doing something he might not have wanted to do in the first place and then could become convinced it was his own idea.

The custodian of records for the Riverside County Jail testified that the only disciplinary marker defendant received while in jail prior to and during trial in this case was for his possession of dice in violation of facility rules.

## II. GUILT PHASE ISSUES

### A. The admissibility of defendant's admissions and confessions

Defendant unsuccessfully moved at his preliminary hearing to suppress his taped-recorded admissions and confessions on the ground that they were coerced by a promise of leniency. He later renewed his suppression motion, claiming his statements to police were involuntary under the totality of the circumstances, that the police and Dr. Rath failed to respect his invocation of his right to remain silent in violation of *Miranda, supra,* 384 U.S. 436, and that Rath failed to inform him of his rights in violation of *Miranda*. Defendant's motion was ultimately heard as a pretrial motion in limine and after an extended evidentiary hearing, it was denied. The trial court found defendant's statements were freely and voluntarily made and that there was no *Miranda* violation. The trial court denied defendant's motion for reconsideration made during the prosecution's case-in-chief and denied defendant's new trial motion, which included a claim that his statements were wrongly admitted.

On appeal, defendant contends the trial court violated his rights to due process and against self-incrimination under the Fifth and Fourteenth

16

Amendments to the United States Constitution and article I, section 7 of the California Constitution, when it overruled his legal challenges to the police interrogation tactics, which he claims vitiated his *Miranda* waiver, overbore his will and rendered his confessions involuntary. We reject defendant's contentions.

### 1. *Defendant's claim regarding the interview in his bedroom*

Defendant first contends his interrogation by Detective Stotz and Deputy District Attorney Mitchell in his bedroom on the evening of the killing was custodial and because he was not read and did not waive his *Miranda* rights, his responses should have been suppressed.

### a. *Additional factual background*

Detective Stotz first spoke with defendant on the day of the killing for about 10 minutes at defendant's front door. Stotz went on to canvass other neighbors. He learned that Melissa had confided in a 13-year-old neighbor that, two or three weeks before the murder, defendant had entered the Middleton home around midnight, tried to rape Melissa and then choked her.

Detective Stotz returned to defendant's home with Detective Lynn, where they spoke with defendant and his sister Stacey. After defendant misrepresented the level of his acquaintance with Melissa, Lynn asked Stacey to step away from defendant so he could talk to her in private. Stotz stayed with defendant and continued to talk with him. Stotz again questioned defendant about his relationship with Melissa and asked defendant if he knew anything about the alleged prior attack on Melissa. Defendant initially denied any knowledge of the alleged prior attack, but later said he thought he knew what Stotz was referring to. Defendant told Stotz about an incident, which he thought occurred two or three weeks earlier, where he woke up in his front yard around midnight wearing jeans and underwear, but no shirt or socks.

17

Detective Stotz returned to the Linton home around 8:00 p.m., accompanied by Mitchell, who was identified to defendant as a deputy district attorney. Mitchell was wearing a suit and tie. Stotz was in plain clothes. Stotz and Mitchell asked defendant to speak with them a little more, making it clear that defendant was not required to speak with them and that defendant was not under arrest. Defendant agreed to speak with them and invited them into his house. Defendant wanted to speak to Stotz and Mitchell away from his parents. Defendant led Stotz and Mitchell back into his bedroom, where all three sat, Stotz and Mitchell in chairs next to each other, and defendant in a chair facing them, four to five feet away. Defendant was not handcuffed or restrained. Stotz repeated that defendant was not under arrest and that he was not required to speak with them.

During the ensuing interview, which Detective Stotz covertly tape-recorded by means of a microcassette recorder in his pocket, defendant denied seeing Melissa on the day of the killing. He denied any involvement in her death. When Stotz returned to the subject of the prior incident of sleepwalking that defendant had earlier recounted, defendant confirmed he had woken up outside of his house two or three weeks earlier, standing there in his pants and underwear. He stated that this occurred about the same time as he last saw Melissa. When Deputy District Attorney Mitchell asked defendant what he had heard happened to Melissa, defendant asserted Stotz had told him that Melissa was strangled with a cord, that she was found dead on the floor of her parent's bedroom, and that there were some fingerprints. Defendant denied speaking to anyone besides Stotz. The interview concluded after approximately a half-hour with defendant's agreement to take a polygraph test and to speak with investigators again the next day.

18

### b. Discussion

Defendant did not challenge the admissibility of the statements he made during the bedroom interview on the ground that the interview was custodial for purposes of *Miranda*. As a consequence, the theory was not litigated and no opportunity was presented to the trial court to resolve any material factual disputes and make necessary factual findings. In fact, defense counsel was not merely silent regarding this issue; in response to trial court comments about defendant being questioned in his bedroom, defense counsel affirmatively conceded defendant was not in custody at the time. Accordingly, defendant has waived his claim that the interview of him in his bedroom constituted custodial interrogation in violation of *Miranda*. (*People v. Cruz* (2008) 44 Cal.4th 636, 669; *People v. Combs* (2004) 34 Cal.4th 821, 845.)

Defendant argues we should nevertheless consider the merits of his claim because it asserts a deprivation of his fundamental constitutional rights. (*People v. Vera* (1997) 15 Cal.4th 269, 277.) As we have recently explained, however, the dictum in *Vera* on which defendant relies "was not intended to provide defendants with an 'end run' around the forfeiture rule," but was limited to a narrow class of constitutional rights, none of which are involved here. (*People v. Tully* (2012) 54 Cal.4th 952, 980, fn. 9.)

Defendant asserts that, if a waiver is found, his counsel's concession of the issue had no tactical basis and therefore amounted to ineffective assistance of trial counsel. To establish ineffective assistance, defendant must show both that his counsel's performance was deficient and that he suffered prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.) Defendant fails to establish any deficient performance by his counsel on the record before us.

"An interrogation is custodial, for purposes of requiring advisements under *Miranda*, when 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " (*People v. Moore* (2011) 51 Cal.4th 386, 394-395, quoting *Miranda, supra*, 384 U.S. at p. 444.) Whether a person is in custody is an objective test; the pertinent question being whether the person was formally arrested or subject to a restraint on freedom of movement of the degree associated with a formal arrest. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400.) "[C]ustody must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances." (*Yarborough v. Alvarado* (2004) 541 U.S. 652, 662.)

The record on appeal reflects that Detective Stotz spoke with defendant twice at his front door as part of a canvass of the neighborhood after Melissa was found dead in her parents' bedroom. Defendant appeared nervous, misrepresented his prior interaction with Melissa, had suspicious injuries on his arm, and connected himself to the prior nighttime incident with Melissa by offering his recollection of himself sleepwalking. Obviously Stotz's suspicions were aroused, but *Miranda* warnings are not required simply because a person has become a suspect in the officer's mind. (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495; *People v. Moore*, *supra*, 51 Cal.4th at p. 402.)

Detective Stotz returned with Deputy District Attorney Mitchell to the Linton home around 8:00 p.m. Stotz and Mitchell were not dressed in a manner that asserted official authority. After Mitchell identified himself to defendant, they asked to speak with him, making it clear that defendant did not have to do so and that he was not under arrest. Defendant invited them into his house, taking them into his bedroom. There is no evidence that either Stotz or Mitchell was armed, or if armed, that any weapon was visible to defendant. There is no evidence that they blocked defendant's exit from the bedroom to which defendant

20

took them.  Defendant was not restrained.  All three of them sat in chairs.  Stotz and Mitchell repeated that defendant was under no obligation to speak to them and that he was not under arrest.  Stotz and Mitchell proceeded to talk with defendant for about a half-hour.  The nature of their questioning does not appear to have been aggressive or particularly confrontational.  (See *People v. Stansbury* (1993) 4 Cal.4th 1017, 1050, revd. on other grounds in *Stansbury v. California* (1994) 511 U.S. 318, 325-326; see also *People v. Lopez* (1985) 163 Cal.App.3d 602, 608 & fn. 4.)  A reasonable person in defendant's situation would have understood he was free to stop the interview and ask Stotz and Mitchell to leave at any time.  Defendant was not in custody.

Defendant's argument that the totality of the circumstances here is analogous to *United States v. Craighead* (9th Cir. 2008) 539 F.3d 1073 lacks merit.  In *Craighead*, FBI agents obtained a warrant to search Craighead's home for child pornography.  (*Id.* at p. 1078.)  Eight law enforcement officers from three different agencies participated in the subsequent search.  All of the officers were armed, some wore protective gear, and some unholstered their guns in Craighead's presence.  (*Ibid.*)  Although one of the FBI agents stated that they would like to talk with Craighead, "that he was not under arrest, that any statement he might make would be voluntary, and that he would not be arrested that day regardless of the information he provided," she and another officer "directed" Craighead to a cluttered storage room at the back of the house for a private conversation while other officers proceeded with the search of his home.  (*Ibid.*)  The second officer, who was dressed in a flak jacket and was visibly armed, stood leaning against the wall near the storage room door, in such a manner as to block Craighead's exit from the room.  (*Id.* at pp. 1078-1079.)  The Ninth Circuit Court of Appeals found the totality of these circumstances "turned the otherwise comfortable and familiar surroundings of the home into 'a police-dominated atmosphere' " that amounted to

custody for purposes of *Miranda*. (*United States v. Craighead, supra*, at p. 1083.) No similar police-dominated atmosphere was shown here.

Because there appears to have been no sound basis for counsel to have objected to the admission of defendant's bedroom statements on the grounds of a *Miranda* violation, no deficient performance by counsel has been established. (*People v. Lewis* (2001) 26 Cal.4th 334, 359 ["Where 'there was no sound legal basis for objection, counsel's failure to object to the admission of the evidence cannot establish ineffective assistance.' "].)

### 2. *Defendant's claim regarding his* Miranda *waiver at the police station*

Defendant contends Detective Stotz and Deputy District Attorney Mitchell made a false promise of leniency during their interview of him in his bedroom and that such promise vitiated his subsequent waiver of *Miranda* rights the next morning. Specifically, defendant claims his *Miranda* waiver at the police station was not knowing and intelligent and, therefore, was invalid, because it was based on the misrepresentation by Stotz and Mitchell on the previous evening that defendant would not get into trouble for admitting the prior assault on Melissa or admitting a sexual interest in or sexual conduct with Melissa.

### a. *Additional factual background*

During the course of the interview of defendant in his bedroom on the night of Melissa's death, defendant told Detective Stotz and Deputy District Attorney Mitchell that he had no recent fights or problems with Melissa, but that he had heard Melissa did not like him. Stotz asked defendant why, if Melissa did not like him, she would tell her friends that she and defendant had "messed around." Stotz asked defendant if he and Melissa had ever kissed and defendant said "[n]o, I never." Stotz continued, "or made out" and told defendant "you're not gonna get in trouble for that, y'know, we just wanna know [that]." Defendant asked Stotz:

22

"why wouldn't I get in trouble for that?" Stotz replied: "Well, because, frankly, because she's no longer living, y'know. Nothing would happen to you if — if you had kissed her or grabbed her or touched her or even had sex with her. Y'know, at this point she's — she's no longer the victim wouldn't be her. She's no longer with us. [S]o nothing would happen to you. We just need to know because — okay." Defendant responded: "Okay. Of course you know I'm not confessing to that." Stotz and Mitchell both explained that they had a responsibility to inquire.

Later in the interview, Mitchell asked defendant what he had heard happened to Melissa. Defendant provided details regarding the circumstances of Melissa's death that Stotz had not told him. Defendant denied speaking to anyone else.

Deputy District Attorney Mitchell informed defendant that in order to clear everybody from the neighborhood of suspicion, they were going to ask all the neighbors who were home at the time of the murder to take a polygraph test. When Mitchell started to ask defendant if he was willing to take the test, defendant expressed concern that if he was nervous, the polygraph would be "set off." Asked if he had something to be nervous about, defendant said he was just very nervous. Detective Stotz assured defendant that he would be told all the questions in advance and have a chance to go over them. Defendant could tell the examiner if he had any concerns.

Mitchell then stated: "Like, if — if you and Melissa had had some problems sexually in the past and you're trying to hide that, that might set if off, so you'd have to tell us about that ahead of time. What we're interested in, the murder, of course, we don't care about anything else that happened, if you and Melissa, she stopped coming over here, 'kay, that's something that's water under the bridge now. We're looking for only the murderer, if you didn't do that, take a

23

polygraph and prove it with your background, with her as long as there isn't something you're hiding, worried about whether or not they're gonna ask questions about this one area, if you actually didn't do the murder but you're trying to hide this other information or problems that you've had with her, that could kind'a skew the results one way or the other."

Defendant eventually agreed to take a polygraph test and speak with investigators the next day, but asked that his parents not be told about it. He asked to be telephoned the next day after his parents left the house. Defendant continued to deny being at the Middleton house the day of the murder and asserted he had nothing to do with Melissa's death.

Stotz telephoned defendant the next morning, as arranged, after defendant's parents left for work. Defendant agreed to meet with investigators. Detectives Lynn and Stotz retrieved defendant from his home in an unmarked car. As noted earlier, during the drive, defendant told the detectives that there was no need for a polygraph test and apologized for wasting their time. He said that he had wanted to turn himself in the previous night, but was not sure he could admit it and he did not want to confess in front of his parents. The officers asked defendant if he was willing to go to the office for a formal interview and he said "Yeah. I'll tell you everything."

At the police station, defendant was taken to Detective Lynn's office while Detective Stotz gathered the equipment necessary for a taped interview. When Stotz returned to the office, Lynn left. Stotz spent a few minutes answering defendant's questions, one of which was whether defendant would be getting the death penalty. Stotz told defendant that he only made recommendations to the district attorney's office, that the district attorney's office actually decided what charges to file and penalties to seek, and that the court determined the penalty. Stotz explained to defendant the interview procedure that would be followed. He

24

then turned on the tape recorder and started the interview by advising defendant of his *Miranda* rights. Defendant indicated he understood his rights and agreed to answer questions. He signed an advisement of rights form indicating the same thing.

### b. Discussion

Defendant claims his *Miranda* waiver was neither knowing nor intelligent because it was based on the false promise by Detective Stotz and Deputy District Attorney Mitchell the previous night that what he said about the prior incident or any sexual interest in or sexual conduct with Melissa would not be used against him. Defendant failed to assert this claim of invalidity of his *Miranda* waiver as part of his suppression motion in the trial court, thereby forfeiting the issue on appeal. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1094.) Defendant's claim is also meritless.

The Fifth Amendment to the United States Constitution, which applies to the states by virtue of the Fourteenth Amendment, provides that no person may be compelled to be a witness against himself or herself. (*Maryland v. Shatzer* (2010) 559 U.S. ___, ___ [175 L.Ed.2d 1045, 1052]; *People v. Tate* (2010) 49 Cal.4th 635, 683.) In *Miranda, supra,* 384 U.S. 436, the United States Supreme Court "adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from the 'inherently compelling pressures' of custodial interrogation." (*Maryland v. Shatzer*, *supra*, at p. ___ [175 L.Ed.2d at p. 1052].) Pursuant to *Miranda*, a suspect "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." (*Miranda, supra,* 384 U.S. at p. 479.)

25

It is well settled, however, that after the familiar *Miranda* advisements are given, a suspect can waive his or her constitutional rights. (*People v. Tate, supra*, 49 Cal.4th at p. 683.) To establish a valid *Miranda* waiver, the prosecution bears the burden of establishing by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary under the totality of the circumstances of the interrogation. (*People v. Williams* (2010) 49 Cal.4th 405, 425.)

The record here reflects that defendant connected himself to the prior nighttime attack reported by Melissa to her parents and a neighborhood friend when he told Detective Stotz during their second conversation at his front door about an incident in which he recalled waking up semiclothed outside his house. When Stotz and Deputy District Attorney Mitchell asked defendant about that incident during their subsequent bedroom interview, defendant confirmed he woke up outside of his house two or three weeks earlier standing in his pants and underwear. When asked about a report that Melissa and defendant had "messed around," defendant denied he had ever kissed or "made out" with Melissa. Stotz assured defendant that he was not going to get in trouble for what happened earlier. When defendant asked why not, Stotz explained the reason that he would not get in trouble — even if he kissed, grabbed, touched or had sex with Melissa — was because Melissa was no longer alive. Defendant responded: "Okay. Of course you know I'm not confessing to that." Mitchell later told defendant that "[w]hat we're interested in, the murder, of course, we don't care about anything else that happened, if you and Melissa, she stopped coming over here, 'kay, that's something that's water under the bridge now. We're looking for only the murderer, if you didn't do that, take a polygraph and prove it . . . ."

Even if defendant understood the comments of Stotz and Mitchell to unconditionally promise that he would not "get in trouble" for any prior assault,

26

we conclude the record does not support defendant's claim that such comments invalidated his waiver of his *Miranda* rights the next morning.

After Detectives Stotz and Lynn picked defendant up from his house the next morning, and during the subsequent ride, defendant tacitly confessed to killing Melissa by telling the officers he had wanted to confess when he was questioned the previous evening, but he was not sure he could admit it. He also explained that he did not want to confess in front of his parents. He said he would "tell them everything" at the police station. At the station, defendant demonstrated his understanding of the seriousness of the potential charges against him by asking whether he was going to be getting the death penalty. Nothing in Stotz's response promised defendant that he would not face such penalty. When Stotz started the formal interview, he advised defendant of his *Miranda* rights. That is, defendant was expressly told at that point without qualification that "*anything* he [said could] be used against him in a court of law." (*Miranda, supra,* 384 U.S. at p. 479, italics added.) Defendant indicated he understood his rights and agreed to answer questions.

The totality of the circumstances reflects that defendant understood at the time of his waiver that one of the consequences of his decision to waive his rights and talk to police would be the availability of all of his statements for potential use by the prosecution. Indeed, when defendant subsequently expressed reluctance to talk on tape about the prior incident, Stotz assured defendant he understood, that this was just part of the interview, and that defendant was not going to get in trouble for what happened two weeks earlier. Defendant asked, "Why not?" Stotz replied, "Well because like I told you last night, that's water under the bridge." Defendant's response is telling: he next said, "That's until today." (See, *post*, p. 30.) That is, defendant had understood at the time of his *Miranda* waiver that he had not been promised any escape from the criminal consequences of the prior

27

incident. He knew he had not been promised any leniency at all if he had murdered Melissa.

Thus, the record does not establish that at the time defendant waived his *Miranda* rights he was doing so based on an understanding that Stotz or Mitchell had earlier promised him that he would not be subject to the death penalty or that he would not face charges relating to the prior assault of Melissa. Therefore, in the absence of defendant's forfeiture of the issue, we would conclude on the merits that defendant's *Miranda* waiver was knowingly and intelligently given.

### 3. Defendant's claim regarding the voluntariness of his admissions and confessions

Defendant does not challenge the voluntariness of his confession to killing Melissa.[7] Defendant challenges the introduction of his statements admitting his sexual intent and conduct in connection with the murder, and confessing to the prior attempted rape. Defendant claims that he was coerced into making false admissions and confessions by false promises of leniency and by the length and nature of the interrogation given his personal characteristics. We uphold the finding of the trial court that defendant's statements were voluntary under the totality of the circumstances.

### a. Additional factual background

When Detective Stotz questioned defendant at his front door on the day of Melissa's death, he noted that although defendant appeared physically immature

---

[7] Defendant also does not challenge the voluntariness of his admission that he was looking for money to take when he entered the Middleton home both on the day of the murder and during the prior incident. Defendant's entry into the home with the intent to steal on the day of the murder was argued as one of the possible bases for the jury to find true the burglary-murder special circumstance.

28

for his age, he did not appear mentally immature. When defendant was brought to the police station the next morning, Detective Lynn sat with defendant while Stotz gathered the equipment necessary for a taped interview. According to Lynn, defendant did not appear intimidated or frightened. At one point, defendant accused Lynn of laughing at him when Lynn had not done so. Lynn described defendant as being almost the opposite of submissive.

When Stotz returned to the office, Lynn left. As noted earlier, Stotz spent a few minutes answering defendant's questions, one of which was whether defendant would be getting the death penalty. Stotz explained his limited role in determining the charges and penalties defendant might face. Stotz then explained to defendant the interview procedure that would be followed. He turned on the tape recorder and started the interview about 9:45 a.m. by advising defendant of his *Miranda* rights. Defendant waived his rights and agreed to answer questions.

At the beginning of the interview, defendant provided a brief description of entering the Middleton house, Melissa screaming, and his strangling her to death. In followup questioning, Stotz asked defendant if he had any idea why Melissa started screaming as soon as she saw him and speculated that Melissa was afraid of defendant because of the prior assault. Defendant agreed that she might have been afraid of him and that something had happened a couple of weeks earlier.

Defendant expressed reluctance to talk about the prior assault on tape. Specifically, defendant responded to Stotz, "Yeah, you know about that [the prior assault], yeah, you don't need to record that do you? Stotz replied that he needed to know a little background on what happened. Defendant again asked why that needed to be recorded. Stotz told defendant that he needed to know because when they talked the night before, defendant said nothing happened during that incident. Defendant explained, "That's because my parents were home." Stotz explained that his questions regarding the prior incident were part of the interview and

29

repeated that defendant would not "get in trouble for what happened two weeks ago, okay?" When defendant asked why not, Stotz responded, "Well because like I told you last night, that's water under the bridge." Defendant replied, "That's until today." Stotz answered, "No, that's got nothing to do with it, I just need to know why she would see you and why she would run away from you screaming like that and it's kind of odd for a neighbor who lived there for six years. For instance, if my neighbor walked into my house that I've known for six years, I wouldn't just run away screaming . . . ." Defendant responded that Melissa was just barely screaming when she ran into her parent's room.

Detective Stotz continued to question defendant about the circumstances of Melissa's death. When he asked defendant if defendant raped Melissa, defendant denied doing so. Defendant suggested that if he had, they would have "found something in there," provided "you didn't plant something." Defendant also denied having sex or trying to have sex with Melissa during the prior incident two weeks earlier. Defendant was questioned a few minutes more before a 35-minute break was taken.

Questioning resumed at 10:40 a.m. with Deputy District Attorney Chessell present in addition to Detective Stotz. Over the course of the next 40 minutes, defendant admitted that he went to the Middleton house to steal on the day of the killing and was looking for money when he went into the house in the prior incident. Defendant denied that he went into the house intending to sexually assault Melissa that day or during the prior incident. The officers confronted him multiple times with a request for an explanation of why Melissa's shorts were unzipped when she was found dead. After offering a number of possible explanations, defendant eventually admitted that when he went into the house and realized Melissa was home, the thought crossed his mind to have sex with her, and he unzipped her shorts. He claimed he did so just to frighten her. He denied

30

sexually assaulting her. After multiple denials, defendant additionally admitted he used a key to get into the Middleton house both times. He said he threw the key in the trash after the killing. This segment of the interview ended at 11:20 a.m., with Stotz offering defendant another soda and Chessell offering him something to eat.

Dr. Rath began his interview of defendant around 12:45 p.m. Rath explained that he had been asked by the prosecution to talk to defendant about his background and history in order "to figure out what was going on with you mentally at the time all of this happened." Rath told defendant that the interview would be tape-recorded and that "[p]eople involved in your case will be listening to the tape to hear what you say later on." Rath proceeded to ask defendant a number of questions about his medical, school, and family history. They discussed some of the details regarding defendant's killing of Melissa and the previous incident at her house. Defendant told Rath he went into the Middleton house both times looking for money. Asked by Rath how Melissa's shorts came to be unbuttoned and unzipped, defendant said he was trying to scare her into thinking he was going to do something, but he claimed he "wasn't gonna." He denied he ever had sexual fantasies about Melissa or that he ever became sexually aroused when he had contact with her.

After defendant finished taking the MMPI test given by Dr. Rath, Detective Stotz resumed his interview of defendant. Detective Rodriguez joined Stotz and defendant about five minutes later. Stotz took defendant through the description of the killing once again, eventually expressing dissatisfaction with defendant's continued claim that he went to the house looking for money, not sex, and that he did not have sex with Melissa. Stotz told defendant he thought defendant tried to rape Melissa during the prior assault and that was why Melissa was afraid when she saw defendant in her house on the day of the killing. Defendant equivocated, saying he had been under the influence of speed on the earlier occasion.

31

Detective Stotz told defendant: "The sooner you tell me the truth, the sooner I'll turn this machine off and the sooner we'll all be on our way." Detective Rodriguez added his belief that defendant would feel a lot better if he told the entire truth. After declining a glass of water and indicating he was not hungry, defendant asked, "So I have to say it?" Stotz responded, "I want [you] to tell me the truth." Defendant asked, "Why with the tape on?" Stotz explained that he did not take notes well, to which defendant replied, "So I have to say it out loud?" Stotz answered, "Yes, you do." Defendant then stated, "I tried to rape her." He said this happened "the very first time like two months ago whatever whenever it was." He also admitted the thought of raping Melissa crossed his mind when he unzipped her pants on the day of the killing, but he changed his mind. He "disdained" the thought.

Just before the interview ended at 4:00 p.m., defendant acknowledged that he had not been threatened or coerced to speak with the police. Defendant said, "I thought I should report myself."

### b. Discussion

According to defendant, the entire thrust of his interrogation was a prosecution effort to get him to admit a sexual motive that would support a special circumstances murder charge. To that end, defendant claims both Detective Stotz and Deputy District Attorney Mitchell falsely told him during the bedroom interview he would not face any criminal consequences for any prior sexual encounter with Melissa. Defendant contends Stotz repeated the assurance the next morning a short time into the police station interview by again stating the prior incident was "water under the bridge" and affirming that was still true when defendant questioned whether circumstances had changed. Defendant contends

32

Stotz's comments constituted promises of leniency that rendered his subsequent admissions and confession involuntary and inadmissible.

Both the state and federal Constitutions bar the prosecution from introducing a defendant's involuntary confession into evidence at trial. (*People v. Carrington* (2009) 47 Cal.4th 145, 169 (*Carrington*); *People v. Holloway* (2004) 33 Cal.4th 96, 114.) " 'A statement is involuntary if it is not the product of " 'a rational intellect and free will.' " [Citation.] The test for determining whether a confession is voluntary is whether the defendant's "will was overborne at the time he confessed." ' " (*People v. McWhorter* (2009) 47 Cal.4th 318, 346-347 (*McWhorter*); accord, *Carrington, supra,* at p. 169.)

" 'A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence. [Citation.] Although coercive police activity is a necessary predicate to establish an involuntary confession, it "does not itself compel a finding that a resulting confession is involuntary." [Citation.] The statement and the inducement must be causally linked. [Citation.]' [Citation]." (*McWhorter, supra,* 47 Cal.4th at p. 347.) A confession is not rendered involuntary by coercive police activity that is not the "motivating cause" of the defendant's confession. (*People v. Williams* (1997) 16 Cal.4th 635, 661.)

"The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made." (*Carrington, supra,* 47 Cal.4th at p. 169.) "Whether a confession was voluntary depends upon the totality of the circumstances." (*People v. Scott* (2011) 52 Cal.4th 452, 480, accord, *People v. Tully, supra,* 54 Cal.4th at p. 993.) "On appeal, we conduct an independent review of the trial court's legal determination and rely upon the trial court's findings on disputed facts if supported by substantial evidence." (*People v. Williams, supra,* 49 Cal.4th at p. 425.) The facts surrounding an admission or

confession are undisputed to the extent the interview is tape-recorded, making the issue subject to our independent review. (*McWhorter*, *supra*, 47 Cal.4th at p. 346.)

Detective Stotz's comments during the police station interview (*ante*, at p. 30) constituted implied promises of leniency concerning prosecution of defendant for the prior assault or capital murder. And, for purposes of this claim, we assume the statements made by Stotz and Deputy District Attorney Mitchell during their earlier interview of defendant in his bedroom were understood by defendant to be implied promises of leniency. (See *ante*, at pp. 22-24, 26-27.) Nevertheless, the evidence fails to show that they were the "motivating cause" of defendant's subsequent admissions and confession. (*People v. Williams, supra,* 16 Cal.4th at p. 661.)

The record reflects that defendant wanted to tell Detective Stotz and Deputy District Attorney Mitchell about the killing and the prior assault when they were questioning him in his bedroom on the evening of the killing, but defendant was not sure he could make the admissions then and, in any event, did not want to confess in front of his parents. Defendant apologized the next morning for wasting the officers' time. He stated that a polygraph test was unnecessary; he would tell them everything. During the questioning that followed, defendant expressed reluctance to talk about the prior assault only because he did not want his statements tape-recorded. When Stotz promised leniency to defendant, defendant did not immediately respond by admitting his sexual interest in or sexual conduct with Melissa, which would have reflected his reliance on such promise. Defendant consistently denied any sexual interest in or conduct with Melissa. After a half-hour break, questioning resumed with Deputy District Attorney Chessell present; defendant then eventually admitted the thought crossed his mind to have sex with Melissa when he entered the house, but he vehemently

34

denied that he acted on the thought, saying he unzipped her shorts only to frighten her. Defendant provided the same explanation to Dr. Rath and continued to deny any sexual interest in or conduct with Melissa. Only late that afternoon during further questioning by Detectives Stotz and Rodriguez, after defendant was unable to adequately explain why he went upstairs when he realized Melissa was home, why she ran screaming from him, and how her shorts came to be unbuttoned and unzipped, did defendant admit his prior attempt to rape Melissa and his thought to rape her on the day of the killing. Defendant's concern at that time still appeared to be having his confession tape-recorded — and not what additional punishment might result. The record does not substantiate the claim that defendant's admissions/confession and any promise of leniency were " 'causally linked.' " (*McWhorter, supra,* 47 Cal.4th at p. 347; accord, *Carrington, supra,* 47 Cal.4th at pp. 170-171.)

Defendant nevertheless claims coercive police interrogation tactics resulted in his admissions and confession, emphasizing the repetitive nature of the questions asked about his sexual interest in and sexual conduct with Melissa, the length of the interview from morning until late afternoon, and his personal psychological characteristics. We find no improper police conduct.

As we previously noted, defendant connected himself to the prior reported assault on Melissa when he was questioned the second time at his front door. It was natural and appropriate for the officers to seek clarification from defendant as to what happened. Because the prior assault would logically help explain defendant's conduct on the day of the killing, there was nothing improper about the officers continuing to explore the subject when defendant was unable to adequately explain the motivation for his acts. We see nothing improper in the officers asking defendant a number of times and in a number of different ways about his sexual motivation and conduct, especially given defendant's pattern of

35

evasive answers and his lies about the possession of the Middletons' house keys. There was nothing coercive in the officers urging defendant to tell the truth and informing defendant of the obvious point that the sooner he told the truth, the sooner the interview would finish. (*People v. Davis* (2009) 46 Cal.4th 539, 600.) Moreover, our review of the tapes of defendant's interviews at the police station reveals that no one questioning defendant used any aggressive, hostile, or threatening tone in questioning defendant. Although there were repeated questions regarding defendant's possible sexual interest in and sexual conduct with Melissa, the overall approach of the officers remained low key. There is nothing to indicate Dr. Rath was employed, as defendant suggests, as part of an overall strategy to "soften him up."

With respect to the length of the interviews, the record reflects that defendant was questioned for a total of two and a quarter hours and spent an hour and 25 minutes completing the MMPI testing. Multiple breaks were taken. He was offered both food and drink. He accepted at least one soda, but declined any food. When he was asked if he was tired, he responded that he just did not like being questioned. These circumstances hardly reflect the kind of continuous, prolonged interrogation that has been found to render a resulting confession involuntary. (See *Reck v. Pate* (1961) 367 U.S. 433, 441; *Ashcraft v. Tennessee* (1944) 322 U.S. 143, 153-154.)

Defendant emphasizes, however, that his personal characteristics rendered him more vulnerable to improper coercion. He notes that he was 20 years old, but looked 15. He still lived with his parents. He was not employed outside the home. He did not have a driver's license. He had a history of learning disabilities and had been in special education classes in elementary school. He had graduated high school, but was not going to college. He had no experience in the criminal justice system. Defendant claims he suffered from depression, anxiety, and

36

headaches. According to defendant, he had been diagnosed with attention deficit disorder and may have had a dissociative disorder. He had suffered physical abuse from his father. Additionally, defendant argues, he had a history of methamphetamine and marijuana use.

"Insofar as a defendant's claims of involuntariness emphasize that defendant's particular psychological state rendered him open to coercion, this court has noted that '[t]he Fifth Amendment is not "concerned with moral and psychological pressures to confess emanating from sources other than official coercion." ' " (*People v. Smith* (2007) 40 Cal.4th 483, 502; accord, *People v. Dykes* (2009) 46 Cal.4th 731, 753.) There is no indication here of coercive tactics by the individuals interviewing defendant, including any evidence that they exploited any personal characteristics of defendant in order to obtain his admissions and confession. Indeed, defendant expressly acknowledged at the end of the interview that he had not been threatened or coerced. He said he thought he should report himself.

The trial court properly concluded defendant's admissions and confession were voluntarily made and, therefore, admissible.

### B. Exclusion of evidence relevant to defendant's claim that he was coerced into making false admissions and confession

Defendant contends the trial court unfairly frustrated defense efforts to present a defense establishing defendant was coerced into making false admissions and his confession. Defendant claims the trial court's rulings violated his constitutional rights to due process and the confrontation of witnesses under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and article 1, section 7 of the California Constitution. We reject defendant's claims.

37

### 1. *The proffered expert testimony of Dr. Richard A. Leo*

#### a. *Procedural background*

Prior to trial, defendant filed a motion to introduce the expert testimony of social psychologists Dr. Richard Ofshe or Dr. Richard Leo regarding police interrogation techniques and false confessions. (See Ofshe & Leo, *The Decision to Confess Falsely: Rational Choice and Irrational Action* (1997) 74 Denv.U. L.Rev. 979, 1117.) Defendant asserted such testimony was relevant to determine the voluntariness and trustworthiness of the statements he made at the police station. At trial, defendant sought to introduce the testimony of Dr. Leo.

In a declaration submitted by defendant to the trial court in connection with his efforts to introduce this testimony, Dr. Leo averred that "[c]ontrary to public myth and mis-perception, it is well documented that police interrogators can and do elicit false confessions in response to common, psychological methods of interrogation." According to Leo, research has established that "certain police interrogation techniques are correlated with the likelihood of a false confession" and such "research findings are beyond the common understanding of the lay person." Leo's proposed trial testimony would address "the following *general* topics: the use of influence, persuasion and coercion during interrogation; how certain police interrogation techniques affect the decision-making of custodial suspects; why certain psychological techniques are coercive and their likely effects; how and why contemporary police interrogation techniques can lead guilty suspects to make the decision to confess; how and why contemporary police interrogation techniques can lead the innocent to make the decision to confess; and how to apply generally accepted principles to evaluate the reliability of confessions statements."

The prosecutor opposed the defense motion, arguing there was no foundation for such testimony because defendant had not recanted his confession

38

and because there was no other evidence that his confession was false. The prosecutor also contended that the defense had failed to show the subject matter was a valid, accepted area of expertise or that the testimony would assist the jury.

The defense countered that a recantation was unnecessary before an expert could be called, that it would be unconstitutional to require defendant to testify his confession was false before the testimony could be admitted, that there was sufficient evidence of falsity in the testimony from both pathologists that Melissa could not have been strangled with the headphone cord in the manner defendant described, and that testimony regarding the general factors that might lead to a false confession was beyond the knowledge of an average person. The defense repeated the claims that express promises of leniency had been made to defendant and that the interviewers' questioning was coercive in light of defendant's personal characteristics.

The trial court ultimately excluded Dr. Leo's testimony under Evidence Code section 352. Specifically, the court concluded the proffered testimony was "extremely speculative" because there was no "basis or foundation" to indicate defendant's confession was false. The court noted defendant was not required to testify, but there was no evidence defendant had otherwise recanted his confession and the pathologists' testimony and the physical evidence did not establish any falsity of defendant's interview statements because the testimony and evidence were not incompatible with defendant's explanation of how he choked Melissa. Therefore, the probative value of Leo's testimony, "if any," was substantially outweighed by its undue consumption of time.

Defendant subsequently challenged the trial court's ruling in his new trial motion. The trial court reaffirmed its ruling and denied the motion.

39

### b. Discussion

Defendant contends the trial court erred in excluding his proffered expert testimony regarding false and coerced confessions. The Attorney General counters that the testimony was properly excluded under Evidence Code section 352.

A trial court has broad discretion to exclude relevant evidence under Evidence Code section 352 "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352; accord, *People v. Lee* (2011) 51 Cal.4th 620, 643.) Such "discretion extends to the admission or exclusion of expert testimony." (*People v. Richardson* (2008) 43 Cal.4th 959, 1008; accord, *People v. Curl* (2009) 46 Cal.4th 339, 359.) We review rulings regarding relevancy and Evidence Code section 352 under an abuse of discretion standard. (*People v. Lee,* at p. 643.)

We conclude the trial court did not abuse its discretion in this case by excluding defendant's proffered evidence.

At trial, defendant did not contend his confession to killing Melissa or admission of entering the Middleton house with the intent to steal were false. Defendant offered the expert testimony of Dr. Leo to assist the jury in evaluating only the truthfulness of his admissions of sexual intent and sexual conduct with Melissa and his commission of the prior offenses. As was his right, defendant did not testify and thus did not deny the truth of his interview statements. There was no other evidence offered that logically called into question the veracity of his admissions. The only evidence that defendant pointed to as showing he made *any* false statements during his police station interview was the testimony of the two pathologists that Melissa was not likely strangled from the front in the manner

40

described by defendant. And yet Dr. Choi testified that the linear marks on Melissa's neck could have resulted from a cord placed around Melissa's neck if her hair was in between the cord and her neck and if the ligature was pulled from one side or another, a scenario not wholly unlike defendant's uncertain recollection of his precise actions. Choi's opinion accounted for the finding of the headphones with a broken cord near Melissa's body, whereas Dr. Spitz's version of the strangulation did not.

Not only was there a dearth of evidence indicating a false admission or confession, a multitude of corroborative evidence had been introduced at the time of the trial court's ruling that suggested defendant's admissions and confession were true. Melissa's parents both testified regarding the prior assault on Melissa by a nude man, although they thought the incident was a nightmare. Defendant's friend Montero also testified regarding the prior assault, stating that defendant returned home out of breath and looking frightened approximately 15 to 20 minutes after Montero spoke with Melissa's father, Robert. When Melissa was found dead, her shorts were unbuttoned and unzipped. And, a pair of her underpants was found in the trash can along with the keys to the Middleton home, which defendant described discarding after the killing. The fact that defendant's semen was found on that underwear suggests an obvious sexual interest in Melissa. We also note both our earlier conclusion that defendant's interrogators did not act improperly in their questioning of him and the circumstance that defendant never claimed his interview confession to killing Melissa or his admission to entering the Middleton home looking for money to steal was false.

Under these facts, it fell within the trial court's broad discretion to determine that Dr. Leo's proffered testimony had, at most, minimal probative value, which was substantially outweighed by its likely undue consumption of

41

time.  (*People v. Ramos* (2004) 121 Cal.App.4th 1194, 1206-1207; *People v. Son* (2000) 79 Cal.App.4th 224, 241; cf. *People v. Page* (1991) 2 Cal.App.4th 161.)

Our conclusion that the trial court did not abuse its discretion under Evidence Code section 352 is consistent with *United States v. Hall* (7th Cir. 1996) 93 F.3d 1337 (*Hall*), the case on which defendant primarily relies.[8]  In *Hall,* the federal district court rejected the proffer of Dr. Ofshe's testimony in its entirety because "in the final analysis, Dr. Ofshe's testimony would add nothing to what the jury would know from common experience."  (*Id.* at p. 1341.)  The Seventh Circuit Court of Appeals reversed based on its inability to be confident that the district court had applied the correct legal framework in making its ruling.  (*Id.* at p. 1342.)  It stated that the district court's ruling that Ofshe's testimony had no potential usefulness because it was within the jury's knowledge "overlooked the utility of valid social science."  (*Id.* at p. 1345.)  "Properly conducted social science research often shows that commonly held beliefs are in error.  Dr. Ofshe's testimony, assuming its scientific validity, would have let the jury know that a phenomenon known as false confessions exists, how to recognize it, and how to decide whether it fit the facts of the case being tried."  (*Ibid.*)

In contrast to the ruling of the district court in *Hall*, the trial court here did not exclude the testimony of Dr. Leo based on a conclusion that this type of expert testimony was inadmissible per se.  The trial court acknowledged that the expertise of Dr. Ofshe or Dr. Leo might be helpful to a jury in certain factual situations, but concluded that under the specific facts here the proffered evidence was "highly speculative" and should be excluded under Evidence Code section

---

[8]    We are not bound, of course, by decisions of the lower federal courts, even on federal questions, but they may be considered for their persuasive weight. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 58.)

352. This ruling is consistent with the observation in *Hall* that even if expert testimony will assist the jury, it is still subject to "the normal controls on scope of testimony and relevance." (*Hall, supra,* 93 F.3d at p. 1344.)

Our conclusion leads us to reject defendant's claim that the trial court's ruling violated his right to present a defense. (*Crane v. Kentucky* (1986) 476 U.S. 683, 688-691; *Chambers v. Mississippi* (1973) 410 U.S. 284, 302 (*Chambers*).) Although a defendant has the general right to offer a defense through the testimony of his or her witnesses, "a state court's application of ordinary rules of evidence — including the rule stated in Evidence Code section 352 — generally does not infringe upon this right." (*People v. Cornwell* (2005) 37 Cal.4th 50, 82, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421; see *Crane v. Kentucky,* at pp. 689-690.) The ruling excluding the testimony of Dr. Leo under Evidence Code section 352 did not result in the blanket exclusion of evidence concerning the circumstances of defendant's admissions and confession, which would have been necessary in order for defendant to claim undue influence. The jury listened to tape recordings of defendant's interviews at the police station, heard the testimony of Detectives Lynn and Stotz, Deputy District Attorney Chessell, and Dr. Rath regarding the circumstances of those interviews, and heard the expert testimony of Dr. Whiting regarding defendant's particular personality traits that may have lowered his ability to withstand the pressures of interrogation and increased his suggestibility. The jury had the testimony of both pathologists regarding the manner in which Melissa was strangled to consider against defendant's description of his actions. Defendant was able to and did strenuously argue this evidence established his admissions and confession were false, as the stress-compliant result of coercive and suggestive questioning.

## 2. The trial court's refusal to allow the defense to call Mitchell as a witness

Defendant claims the trial court denied him his federal constitutional right to present a defense and confront a critical percipient witness when it refused to allow the defense to call as a witness Deputy District Attorney Mitchell, who was the prosecutor in this case. We disagree.

### a. Background

Mitchell was the "on-call" deputy district attorney the week of Melissa's death and as such, responded to the crime scene on November 29 in order to assist law enforcement in the investigation. He accompanied Detective Stotz to defendant's home and was present during the bedroom interview of defendant on the evening of the killing.

Prior to that interview, Mitchell had advised Stotz to keep the interview "low-key" and directed him to turn on the microcassette recorder Stotz had in his pocket so that the interview would be tape-recorded. The tape turned out to be difficult to hear. Initially, the comments by Stotz that defendant would not get into trouble for previous sexual conduct with Melissa and Mitchell's comments regarding such conduct, if any, being "water under the bridge" if defendant was not her killer, were inaudible during a 28-second gap on copies of the tape provided to both the prosecution and the defense. With the assistance of a defense expert in audiology, however, a transcript was later produced from the original tape reflecting such statements.

Deputy District Attorney Mitchell was not present for any other interview of defendant. He was, however, in telephone contact with the police at various times throughout the next day. He was apprised of what was happening in the interviews with defendant at the police station and made suggestions as to possible areas of enquiry. Mitchell arranged for Dr. Rath to evaluate defendant.

44

Prior to trial, defendant moved to exclude evidence claiming that the prosecution had tampered with the bedroom interview tape. The trial court denied the motion after hearing the testimony of the defense audio expert and the case investigator for the district attorney. It found "no credible evidence of police or district attorney misconduct or gross negligence in providing to defense counsel the defective copy of the tape recording." The trial court determined that defendant failed to establish there had been any tampering with the tape.

Defendant also filed a pretrial notice of intent to call Deputy District Attorney Mitchell as a percipient witness to the bedroom interview and as the person who retained the services of Dr. Rath. In light of defendant's intent to call Mitchell as a witness, defendant objected to Mitchell's continuing as the trial prosecutor. Deeming defendant's objections to constitute a recusal motion, the prosecution filed opposition. After hearing testimony from Mitchell regarding his role in the interviewing of defendant by law enforcement, the trial court denied defendant's motion to recuse Mitchell. Defendant's petition for writ of mandate or prohibition, which sought to overturn the trial court's denial of the recusal motion, also was denied.

During trial, near the close of its case, the defense again sought to call Deputy District Attorney Mitchell as a witness. Defendant argued that Mitchell was the best witness of defendant's demeanor and the circumstances of the alleged promises of leniency made to defendant during the bedroom interview. Defendant claimed Mitchell could provide information settling the question of when Detective Stotz obtained the tape recorder he used during the bedroom interview. Further, defendant pointed out that Mitchell made suggestions to the interrogators throughout the next day, hired Dr. Rath, and directed questions designed to support a felony-murder charge.

45

Deputy District Attorney Mitchell responded that defense counsel's offer of proof was fraught with unfounded speculation and misstatements of the evidence. He claimed his testimony would be cumulative to the tape-recording of the bedroom interview and to the testimony of Detective Stotz. Mitchell argued that any suggestions he later made to defendant's interviewers were irrelevant; what was relevant was what actually happened during the interviews of defendant at the police station.

The trial court agreed with Mitchell's position and confirmed that he could not be called as a witness.

### b. Discussion

Defendant asserts the trial court's refusal to allow him to call Deputy District Attorney Mitchell denied him his federal constitutional right to present a defense and confront a critical percipient witness. (*Davis v. Alaska* (1974) 415 U.S. 308, 317; *Chambers, supra,* 410 U.S. at p. 302.) We are not persuaded.

It is generally prohibited for a prosecutor to act as both an advocate and a witness. (Rules Prof. Conduct, rule 5-210.) "Within the criminal justice system, the prohibition against a prosecutor's acting as both advocate and witness addresses 'the concern that jurors will be unduly influenced by the prestige and prominence of the prosecutor's office and will base their credibility determinations on improper factors.' " (*People v. Donaldson* (2001) 93 Cal.App.4th 916, 928-929, quoting *United States v. Edwards* (9th Cir. 1998) 154 F.3d 915, 921.) "Only in extraordinary circumstances should an attorney in an action be called as a witness, and before the attorney is called, defendant has an obligation to demonstrate that there is no other source for the evidence he seeks." (*People v. Garcia* (2000) 84 Cal.App.4th 316, 332.) In this case there were other sources for the evidence defendant sought.

46

Detective Stotz was present with Deputy District Attorney Mitchell for the interview of defendant in his bedroom on the night of the murder. Stotz testified at trial and was subject to vigorous questioning regarding the circumstances of the bedroom interview. There was also independent evidence of what took place at that interview in the form of the audiotape recording contemporaneously made by Stotz with the microcassette recorder in his pocket. The original audiotape did not have any gap in the recording and there was no dispute about the words spoken by Stotz and Mitchell to defendant on the tape. Defendant does not challenge the ruling that there was no tampering with the tape.

The record does not reflect any offer of proof by defendant that Mitchell would have been able to provide testimony concerning defendant's demeanor and the circumstances of the interview that would not be cumulative of what could be shown either by introducing the audiotape, which defendant chose not to do, or by examining Stotz, which defendant did extensively.

With respect to defendant's claim that Mitchell could have impeached Stotz's testimony regarding when he was given the microcassette recorder by Lynn, defendant failed to establish that Mitchell had any knowledge of the matter. But even if Mitchell could have offered some comment about Stotz's possession of the tape recorder, such potential impeachment would not appear to have added significantly to the other instances in which the defense was able to show inconsistencies or inaccuracies in Stotz's testimony. Mitchell's testimony on such a minor point did not justify calling him as a witness.

Nor do we agree with defendant that it was necessary to call Mitchell so that the defense could explore what suggestions Mitchell made to those interviewing defendant at the police station and otherwise delve into Mitchell's motivation for making those suggestions and for hiring Dr. Rath. Such areas of inquiry would not have revealed anything legally significant regarding defendant's

47

claim that he was being pressured into making false statements during the interviews. What mattered to defendant's claim was what actually occurred, what was communicated to him, and how he was questioned during the interviews. The totality of the circumstances of the interviews, and not what the interviewing officers or Dr. Rath had been told outside of defendant's presence, provided the factual context for defendant's claim of coercion.

In arguing the trial court erred in refusing his request to call Mitchell as a witness, defendant relies on *United States v. Edwards, supra,* 154 F.3d 915 (*Edwards*), claiming that case was based on a set of circumstances "remarkably similar to those here." We disagree. In *Edwards*, the prosecutor discovered a receipt with the defendant's name on it at the bottom of the bag in which crack cocaine had been found. The receipt was critical to linking defendant to the bag. Over objection, the prosecutor proceeded to introduce the receipt as evidence in trial through essentially a reenactment of his discovery and then elicited testimony from two officers who were present when he made the discovery that, among other things, the evidence had not been planted. Closing arguments focused on the issue of whether or not the evidence was planted. (*Id.* at pp. 918-921.) The Ninth Circuit Court of Appeals reversed the defendant's conviction based on the conclusion "that when a prosecutor is personally involved in the discovery of a critical piece of evidence, when that fact is made evident to the jury, and when the reliability of the circumstances surrounding the discovery of the evidence is at issue, the prosecutor's participation in the trial of the defendant constitutes a form of improper vouching." (*Id.* at p. 923.)

*Edwards, supra,* 154 F.3d 915, concerns the necessity for recusal of a prosecutor who has discovered critical evidence, rendering the prosecutor a silent witness against the defendant. Defendant, however, has not challenged the trial court's ruling on his recusal motion, rather he challenges the court's denial of his

48

motion to call the prosecutor as a witness. To the extent *Edwards* informs the issue defendant *has* raised, we find it distinguishable. Mitchell did not discover critical evidence analogous to the prosecutor's discovery in *Edwards*, there was no dispute about what was said during the bedroom interview, and evidence of the circumstances of the bedroom interview was available to the jury through the testimony of Stotz and the audiotape made at the time.

The trial court properly exercised its discretion and did not violate defendant's constitutional rights when it precluded defendant from calling Mitchell as a witness.

### 3. Curtailment of defense cross-examination of Stotz

Defendant contends the trial court violated his constitutional rights when it restricted his attempt to fully cross-examine Stotz by sustaining various objections made by the prosecutor. Defendant claims the trial court's rulings improperly restricted him from eliciting testimony in five areas of inquiry: (1) Stotz's understanding of proper interrogation technique; (2) the directions and instructions Stotz received from Mitchell during the interviews conducted at the police station; (3) Stotz's conversation with defendant at the police station before the tape recorder was turned on; (4) untruths and misrepresentations made to defendant to elicit admissions; and (5) the prosecution's strategy to persuade defendant to admit that he intended to rape or sexually assault Melissa either at the time of her death or in the prior assault. We find no abuse of discretion in the trial court's rulings.

### a. The applicable law

The law on this issue is well settled. " '[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby, "to expose to the

49

jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." ' [Citations.] However, not every restriction on a defendant's desired method of cross-examination is a constitutional violation. Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance. [Citations.] California law is in accord. [Citation.] Thus, unless the defendant can show that the prohibited cross-examination would have produced 'a significantly different impression of [the witnesses'] credibility' [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment. [Citation.]" (*People v. Frye* (1998) 18 Cal.4th 894, 946 (*Frye*), disapproved on another ground in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22.)

### b. Questions regarding interrogation techniques

Detective Stotz was working as a plainclothes narcotics officer for the San Jacinto Police Department when he was called to assist with the investigation of Melissa's death. During cross-examination, defendant brought out that this was Stotz's first and only homicide investigation. Stotz testified that he had no specific training in homicide investigations. The only training he had in interrogating suspects was in the police academy, which he had attended 11 years prior to Melissa's murder.

When defendant asked Stotz what he learned in the academy about interrogating suspects in custody, the prosecution objected that the question called for irrelevant information. Noting that the question was also overbroad and vague, the trial court sustained the objection. Defendant complains that the trial court sustained the objection on the ground that the question was overly broad and vague, but then proceeded to disallow four follow-up questions that attempted to

50

narrow the area of inquiry. Defendant asserts the court thereby denied him the right to lay the necessary and proper foundation for challenging his confession as involuntary or false.[9]

The authorities defendant cites (*Missouri v. Seibert* (2004) 542 U.S. 600, 611; *Miller v. Fenton* (1985) 474 U.S. 104, 109; *Arizona v. Mauro* (1987) 481 U.S. 520, 532, fn. 1 (dis. opn. of Stevens, J.); *Orozco v. Texas* (1969) 394 U.S. 324, 328-329 (dis. opn. of White, J.)) do not support his assertion that in order to challenge a confession as involuntary or false, it is necessary to lay a foundation as to a police officer's experience and training in interrogation techniques. The trial court did not err in its rulings. Moreover, the jury here learned this was Stotz's first and only homicide investigation. The jury learned that he had only basic training in interrogation and that such training occurred more than a decade earlier. Under these circumstances, even if we were to assume error, the trial court's sustaining of the objections to the further questions regarding Stotz's training was harmless. Assuming the questions posed would have adduced further evidence of Stotz's lack of training and experience, it would not "have produced 'a significantly different impression' " of Stotz. (*Frye, supra,* 18 Cal.4th at p. 946; accord, *People v. Hines* (1997) 15 Cal.4th 997, 1047.)

---

[9] The four followup questions asked Stotz if he had (1) "any training on the job as well from any officers"; (2) "any training in — in how to avoid eliciting false confessions"; (3) "any training in the techniques of proper interrogation"; and (4) "any training either at the academy or in your experience as a police officer in recognizing false confessions." The prosecutor objected to each question that it was irrelevant and assumed a fact not in evidence. The trial court sustained the objections without comment.

### c. *Questions regarding directions and instructions from Mitchell*

Defendant claims the actions of Deputy District Attorney Mitchell were critical to his contention that his admissions and confession were not reliable. Defendant complains that he was neither allowed to call Mitchell nor allowed to question Detective Stotz about Mitchell's involvement in directing the interrogation process. We conclude the court did not abuse its discretion in its rulings. (*People v. Avila* (2006) 38 Cal.4th 491, 578.)

Stotz testified that he spoke with Mitchell for 10 to 15 minutes before he began the taped interview of defendant at the police station. Stotz testified that Mitchell gave him advice on how to proceed with the interrogation of defendant. Mitchell advised Stotz to make sure the interview was tape-recorded and told him to read defendant his *Miranda* rights and obtain a waiver of them. Because defendant was obviously willing to talk, Stotz explained, Mitchell advised him to keep defendant comfortable and just to speak with him about the incident. Stotz testified that he spoke with Mitchell again in the afternoon just before the final interview of defendant that day, which began at 3:40 p.m. The trial court, however, sustained relevancy objections to additional questions that sought to elicit testimony as to whether Mitchell suggested particular areas of questioning or strategies for the interview.

As we have already explained, Mitchell's suggestions of possible questions or topics for inquiry and his suggestions of strategy, if any, were irrelevant to defendant's claim of being pressured into making false statements. What matters to defendant's claim were the statements made to him by those interviewing him, the actual questions posed, the form, order and number of the questions, and the tone and circumstances of the questioning, all of which were fully presented to the jury through the audiotapes of the interviews and the testimony of Detectives Lynn and Stotz, Deputy District Attorney Chessell, and Dr. Rath.

52

*d. Questions regarding defendant's conversation with officers*
*before the start of the tape*

Defendant attempted to question Detective Stotz regarding his prior testimony concerning the limited conversation he had with defendant before the start of the taped interview at the police station. The trial court sustained objections to two questions as being vague. Defense counsel withdrew a third question.

Defendant does not offer any argument as to why the court's rulings were legally incorrect, but simply avers "the court allowed Mitchell to orchestrate what the defense was, and was not, allowed to elicit" from Stotz. We find no error.

*e. Questions regarding alleged untruths and misrepresentations*
*made to defendant*

Defendant argues the trial court erred in sustaining objections to questions that asked Detective Stotz (1) whether he made it clear to defendant that "the promises [he] made the night before were still in effect"; (2) whether Deputy District Attorney Mitchell ever told Stotz to make sure defendant understood such promises would not be in effect if he confessed to killing Melissa; (3) whether Stotz was "honestly truthful" in making comments to defendant about any sexual conduct being "water under the bridge"; (4) what Stotz told defendant was the purpose of tape-recording the interview; (5) whether Stotz agreed that during the interviews defendant had denied over 40 times any sexual interest in Melissa between November 29 and November 30; (6) whether telling a suspect he will feel better if he confesses is a time-honored interrogation technique used when a suspect is about to crack; (7) whether Stotz thought Detective Rodriguez was "honestly concerned" that defendant would feel better if he confessed, and (8) whether faking concern for a suspect is part of the process of catching a criminal. Such questions, however, called for speculation, were cumulative to the introduced tape-recording, were argumentative, and/or were irrelevant. The trial

53

court properly sustained the prosecutor's objections and we find no impairment, thereby, of defendant's ability to thoroughly cross-examine Stotz. (*People v. Hines, supra,* 15 Cal.4th at p. 1047.)

> ### f. Questions regarding the prosecution's alleged strategy to persuade defendant to admit that he intended to rape or sexually assault Melissa

Finally, defendant contends the trial court erred in sustaining objections to a series of more than 50 questions he posed to Detective Stotz about the closing moments of the interrogation — a time when defendant claims the audiotape reflects that he was tired and hungry. According to defendant, these questions were designed to demonstrate the interrogators' strategy to persuade defendant to admit that he intended to rape or sexually assault Melissa. We have reviewed the record and conclude, however, that many of the questions simply asked Stotz to repeat what he said to defendant, — testimony that was cumulative to the audiotape played for the jury. Many other questions asked Stotz why he asked particular questions and failed to ask others. The trial court correctly ruled that questions seeking Stotz's undisclosed motivation or purpose were irrelevant. Stotz's personal belief and concerns regarding what defendant was telling him were similarly irrelevant. Likewise, the questions that were directed to establishing the alleged primacy of Deputy District Attorney Mitchell's role in the bedroom interview and his behind-the-scenes role in the police station interrogation were cumulative or irrelevant. Other questions were simply argumentative in form or called for speculation. The trial court did not abuse its discretion in sustaining objections to these questions.

## C. The trial court's failure to excuse Juror No. 1

Defendant contends Juror No. 1 committed misconduct by discussing the case with her husband and prejudging it, and that the trial court's failure to excuse

her violated the Sixth and Fourteenth amendments of the United States Constitution, as well as sections 7 and 16 of article I of the California Constitution. Because substantial evidence in the record supports the trial court's factual findings regarding Juror No. 1's conduct, we conclude there was no misconduct. Therefore, the trial court did not err in failing to excuse Juror No. 1.

### 1. Background

On the second day of guilt phase jury deliberations, the trial court received a note from the jury foreperson reporting that another juror had discussed a specific aspect of the case with her husband.

The court met with counsel and the foreperson in the presence of defendant. The foreperson explained that while the jury was discussing Melissa's reaction of screaming when defendant came upstairs, Juror No. 1 stated that she had discussed the issue with her husband and that if somebody came into her house that she knew, she would not automatically scream. According to the foreperson, Juror No. 1 told the other jurors: "I'm the first to admit that I discussed this with my husband and we were talking about the case." The foreperson said Juror No. 1 did not indicate she received any feedback or comments from her husband. It sounded to the foreperson as if she was telling her husband that this is what she would have done. The other jurors told Juror No. 1 that they "didn't want to go there" and there was no further discussion of Juror No. 1's conversation with her husband. The foreperson did not tell the other jurors about his note to the court regarding Juror No. 1.

Defense counsel expressed concern that Juror No. 1's statement to the other jury members indicated a cavalier attitude toward the court's instructions, that she may have discussed other aspects of the case with her husband, and that they had no way of knowing if she was relying on her husband's opinions in her evaluation

of the evidence. The trial court shared defense counsel's concern and instructed the bailiff to call Juror No. 1 into the courtroom.

When Juror No. 1 was brought into court, she admitted making one comment to her husband, but claimed she did not disclose to him any "facts or events going on in the case." Juror No. 1 said she simply told him she did not understand something that was going on and that she was confused because if this had happened to her, she would not react the way this person did. Juror No. 1 claimed she was thinking about the prosecutor's opening statement about Melissa screaming when defendant was standing at the top of the stairs when she made the comment to her husband. Juror No. 1 explained that she thought that she would not "freak out" this way if her neighbor walked in. But, Juror No. 1 testified, she did not say this to her husband. She said only that she was confused and did not understand. She claimed that if anyone had been standing in the room, her statements to her husband "would have made no sense at all." She said her husband just sat there and did not respond. According to Juror No. 1, her husband's reaction was consistent with Juror No. 1's previous instructions to him upon her selection as a juror. She had warned her husband that she might need to vent about the case, but she told him that if she did so, he was not to ask her questions or let her continue. He was just to "kind of sit there and say 'Okay. Enough.'" Juror No. 1 told the court that she and her husband did not discuss her comment or the case at all. She said that she did not "vent" to her husband again during the remainder of the trial.

After both counsel indicated they had no questions, the court confirmed with Juror No. 1 that she understood the court's admonishments and reminded her that they applied until the case was finished. The court said that it sounded as if she had vented, but had not discussed the case. The trial court told Juror No. 1 that her action was right on the edge of what is appropriate and that she should not

repeat it. The court asked Juror No. 1 if she felt "there's anything that's happened here, or even the fact that we called you in, that would affect your ability to either now be a fair and impartial juror or . . . be able to deliberate rationally with the other jurors?" Juror No. 1 responded: "No. Not at all." The court then instructed Juror No. 1 to continue deliberating.

Defense counsel asked that Juror No. 1 be excused, arguing that her claim that she merely vented to her husband and that her husband provided no feedback was disingenuous, if not an outright lie. Defense counsel argued that Juror No. 1 wanted to bring her husband's opinion into deliberations and that there was a real danger she was influenced by her husband's opinions.

The trial court found nothing inconsistent between what Juror No. 1 said and what the foreperson said. The court, therefore, credited Juror No. 1's statements. Although it was "on the edge of propriety" for Juror No. 1 to have said anything at all, the court emphasized that there was no indication anything was said back to her. Indeed, the court observed that nothing suggested Juror No. 1 or any other member of the jury had received any outside information. Noting that it had admonished her to refrain from such conduct in the future, the court concluded it was not necessary or appropriate to excuse her. The court denied defendant's motion for excusal.

    *2. Discussion*

Section 1122 requires the trial court to instruct the jury after it is sworn and before opening arguments regarding "its basic functions, duties, and conduct," including that they "shall not converse among themselves, or with anyone else, . . . on any subject connected with the trial." (§ 1122, subd. (a).) "The jury shall also, at each adjournment of the court before the submission of the cause to the jury, . . . , be admonished by the court that it is their duty not to . . . converse among

57

themselves, or with anyone else, on any subject connected with the trial, or to form or express any opinion about the case until the cause is finally submitted to them." (§ 1122, subd. (b).)

A juror who violates his or her oath and the trial court's instructions is guilty of misconduct. Thus, it is misconduct for a juror to discuss a case with a nonjuror during the course of a trial. (*People v. Lewis* (2009) 46 Cal.4th 1255, 1309.) It is misconduct for a juror to even inadvertently receive information about a party or the case from a nonparty. (*People v. Nesler* (1997) 16 Cal.4th 561, 578-579 (*Nesler*).) Of course it is misconduct for a juror "to communicate with anyone associated with the case." (*People v. Jones* (1998) 17 Cal.4th 279, 310; accord, *People v. Loker* (2008) 44 Cal.4th 691, 754; *People v. Stewart* (2004) 33 Cal.4th 425, 509-510.) Inasmuch as section 1122, subdivision (b) requires the court to admonish the jurors not "to form or express any opinion about the case until the cause is finally submitted to them," a juror who prejudges a case and so fails to deliberate is also guilty of misconduct. (See *People v. Wilson* (2008) 44 Cal.4th 758, 840-841; *People v. Leonard, supra,* 40 Cal.4th at pp. 1410-1411.) " 'When a person violates his oath as a juror, doubt is cast on that person's ability to otherwise perform his duties.' " (*In re Hitchings* (1993) 6 Cal.4th 97, 120; accord, *Nesler, supra,* at p. 578.)

"In determining whether juror misconduct occurred, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.' " (*People v. Schmeck* (2005) 37 Cal.4th 240, 294; accord, *People v. Pride* (1992) 3 Cal.4th 195, 260.) Here the trial court found Juror No. 1's explanation of her actions credible. Although the trial court concluded it was "on the edge of propriety" for Juror No. 1 to have said anything at all to her husband, it found no indication that anything was said back to her or

that anything was passed back to the other members of the jury. We accept these findings because, as we explain, they are supported by substantial evidence.

Although Juror No. 1 admitted making one comment to her husband expressing her confusion over something in the case, she said the comment did not disclose to him any facts or events relating to the case. Juror No. 1 told the trial court that her husband did not respond to the comment she made, which was so general that it "would have made no sense at all" to someone standing in the room. This was not contradicted by the jury foreperson, even though his note to the court and initial in-court description of Juror No. 1's comment to the jury indicated Juror No. 1 had "discussed" an aspect of the case with her husband. In later questioning the jury foreperson told the court he received the impression that Juror No. 1 informed her husband she would have done something different, but that she did not receive any feedback or comments from her husband in return. Thus, the record reflects there was no actual back and forth "discussion" or "conversation" between Juror No. 1 and her husband in violation of section 1122. The evidence supports the court's implicit finding that Juror No. 1 did not commit misconduct by "venting" to her husband. In this regard, Juror No. 1's expression of her confusion to her husband regarding an unspecified reaction by an unspecified person that differed from what she would have done, while unwise, is analogous to the conduct of Juror K.A. in *People v. Danks* (2004) 32 Cal.4th 269, whose expression to her husband of her stress in making a decision in the case did not amount to misconduct. (*Id.* at p. 304.)

Having rejected the claim that Juror No. 1's comment to her husband exposed her to extraneous facts, information or opinion from her husband, we likewise reject defendant's tacit suggestion that Juror No. 1's internal mental comparison of her own reaction to the reaction of Melissa constituted the use of extraneous information outside of the evidence admitted at trial. "Jurors' views of

59

the evidence . . . are necessarily informed by their life experiences . . . ." (*In re Malone* (1996) 12 Cal.4th 935, 963.) A juror's application of his or her everyday life experience to the evaluation of evidence is not misconduct. (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 76-77; *People v. Steele* (2002) 27 Cal.4th 1230, 1265-1266; see also *People v. Fauber* (1992) 2 Cal.4th 792, 838-839.)

Nor does the fact that Juror No. 1 considered the prosecutor's opening statement and expressed to her husband a lack of understanding and confusion because she thought she would react differently establish that she prejudged the case. (See *People v. Allen and Johnson, supra,* 53 Cal.4th at pp. 73, 75.) Jurors are allowed to reflect about the case during the trial and at home. (*People v. Ledesma* (2006) 39 Cal.4th 641, 729-730.) In fact, it is unrealistic to expect them not to do so. (*Ibid.*) Juror No. 1's comment to her husband indicates only such thought. It does not suggest Juror No. 1 would not or did not listen to the evidence introduced at trial and the arguments of counsel. It does not indicate she was unwilling to fairly deliberate when it came time to do so. During the course of deliberations, Juror No. 1 commented to the other members of the jury that she would not automatically scream if somebody she knew came into her house. But such comment simply reflects Juror No. 1 continued to be concerned about this point. It does not reflect a refusal to consider other opinions or to deliberate.

The trial court did not err in denying defendant's motion for excusal.

### D. The trial court's failure to instruct the jury that defendant's unrecorded oral admissions should be viewed with caution

Defendant contends it was constitutional error for the trial court not to instruct the jury with the portion of CALJIC No. 2.70 that directs the jury to view with caution evidence of an out-of-court oral confession or oral admission of the defendant. Defendant claims such error was prejudicial because Detective Stotz's unrecorded second interview of him at his front door on the afternoon of the

killing contained the first purported mention by defendant of his prior sleepwalking incident, which incident became the foundation for the prosecution's prior assault charges and sexual assault special-circumstance allegations. Defendant, however, invited any error.

The record reflects that both defense counsel and the prosecution requested the trial court to instruct the jury on confessions and admissions with CALJIC No. 2.70. As relevant here, the prosecutor requested omission of the portion of the instruction that admonishes the jury to view with caution evidence of defendant's out-of-court oral admissions or confession because defendant's statements had been tape-recorded. (*People v. Mayfield* (1997) 14 Cal.4th 668, 776 ["cautionary instruction is inapplicable, and should not be given, if the oral admission was tape-recorded"].) Defense counsel countered that not all of defendant's out-of-court statements were tape recorded, including his conversations with Stotz at his front door.

The trial court offered to keep the cautionary language in the instruction, but add language limiting it to defendant's statements that were not tape-recorded. Defense counsel objected that such limiting language would in effect tell the jury not to critically view the rest of defendant's statements. Defense counsel argued the jury should be instructed to view confession evidence with caution, whether or not it was recorded. The court disagreed and stated that it was either going to insert language limiting the cautionary instruction to defendant's unrecorded statements or take the admonition out. Defense counsel replied, "Well, then, in light of that, take the whole thing out." The trial court confirmed that defendant wanted to omit the cautionary language. Defense counsel indicated this was correct, but asked that the defense objection be noted for the record.

" 'When evidence is admitted establishing that the defendant made oral admissions, the trial court ordinarily has a sua sponte duty to instruct the jury that

61

such evidence must be viewed with caution. [Citation.] We have explained, however, that "the purpose of the cautionary instruction is to assist the jury in determining if the statement was in fact made. [Citation.]" [Citation.] Accordingly, we also have held that this cautionary instruction should not be given if the oral admission was tape-recorded and the tape recording was played for the jury.' [Citation]." (*People v. Williams* (2008) 43 Cal.4th 584, 639.)

The trial court's proposal — to include the cautionary admonition in the instruction, but limit it to defendant's unrecorded statements — was consistent with this authority. The record reflects defense counsel made a deliberate, tactical choice to have the court omit the cautionary instruction altogether, rather than have it limited. As a consequence, defendant's challenge on appeal to the omission of the cautionary language is barred by the doctrine of invited error. (*People v. Lewis* (2001) 25 Cal.4th 610, 667.)

### E. Asserted cumulative guilt phase error

Defendant contends the cumulative prejudicial effect of the trial court's guilt phase errors violates his right to due process, warranting reversal. We have rejected defendant's claims of error, concluding they were waived, forfeited, invited or are meritless. Where we assumed the trial court erred by sustaining objections to further questioning of Detective Stotz regarding his training, we have found the error to be harmless. We conclude there is no cumulative prejudicial effect of error. Reversal is not required.

### III. PENALTY PHASE ISSUES

### A. The trial court's refusal to allow defendant to call Dr. Leo and Deputy District Attorney Mitchell and its restriction of the proffered testimony of Dr. Whiting

Defendant contends the trial court unconstitutionally deprived him of his ability to present a penalty phase defense and to establish lingering doubt as a

mitigating factor under section 190.3, factor (k), when the court refused to allow him to call Dr. Leo and Deputy District Attorney Mitchell as witnesses for the penalty phase and restricted the proffered testimony of Dr. Whiting.  We disagree.

### 1. The proffered testimony of Dr. Leo

Relying on his offer of proof during the guilt phase of trial, defendant sought to call Dr. Leo to testify during the penalty phase of trial regarding factors that may have caused defendant to give a false confession of sexual interest in and conduct with Melissa as relevant to the issue of lingering doubt under section 190.3, factor (k).

The trial court again excluded Dr. Leo's testimony on the ground that there was insufficient foundational evidence that defendant's confession was false.  The trial court repeated that defendant would not have to testify in order for Leo's testimony to become admissible, but if he chose not to testify there must be some other evidence of falsity.  The trial court rejected defendant's argument that the testimony of the pathologists regarding the method of strangulation was sufficient evidence of falsity.

Defendant contends the trial court's ruling prevented him from presenting material evidence relevant to establishing lingering doubt as a legitimate defense and valid mitigating factor at the penalty phase of his trial.  Defendant claims the exclusion of such vital evidence constituted a denial of a fair trial in violation of due process.  (U.S. Const., 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, & 17.)

A capital defendant has no constitutional right to have the jury consider lingering doubt in choosing the appropriate penalty (*People v. Gay* (2008) 42 Cal.4th 1195, 1220; *People v. Stitely* (2005) 35 Cal.4th 514, 566), but evidence of the circumstances of the offense, "including evidence that may create a lingering

doubt as to the defendant's guilt," is statutorily admissible in the penalty phase of trial as a factor in mitigation under section 190.3. (*People v. Hamilton* (2009) 45 Cal.4th 863, 912.)

This does not mean a defendant has a "right to introduce evidence not otherwise admissible at the penalty phase for the purpose of creating a doubt as to his or her guilt. [Citations.] ' "The test for admissibility is not whether the evidence tends to prove the defendant did not commit the crime, but, whether it relates to the circumstances of the crime or the aggravating or mitigating circumstances." [Citation.]' [Citation.] The evidence must not be unreliable [citation], incompetent, irrelevant, lack probative value, or solely attack the legality of the prior adjudication [citations]." (*People v. Hamilton*, *supra*, 45 Cal.4th at p. 912.) "Evidence that is inadmissible to raise reasonable doubt at the guilt phase is inadmissible to raise lingering doubt at the penalty phase." (*People v. Stitely*, *supra,* 35 Cal.4th at p. 566.)

For the same reasons we rejected defendant's guilt phase argument, we conclude that the trial court did not abuse its discretion by denying defendant's penalty phase request to have Dr. Leo testify. (See *ante,* pt. II.B.1.b., pp. 39-43.)

The exclusion of this evidence did not deprive defendant of the opportunity to present his penalty phase defense or establish mitigating factors. Defendant was still able to and did present evidence supporting his claim of lingering doubt as to whether he truthfully confessed to sexual interest in and conduct with Melissa. The jury was allowed to consider the guilt phase evidence regarding the circumstances of defendant's interviews with authorities through the audiotapes of the interviews and the testimony of Deteceives Lynn and Stotz, Deputy District Attorney Chessell, and Dr. Rath. The jury could consider these circumstances in light of the guilt phase testimony it heard from Dr. Whiting about defendant's physical and mental condition and likely panic attack at the time of the murder. In

addition, at the penalty phase of his trial, defendant called as a witness Robert Osborne, the game leader of the live action role-playing game club that defendant attended for several years prior to the murder. As noted earlier, Osborne testified that defendant was easy to lead into doing something he might not want to do in the first place and defendant could be convinced by other game players that it was his own idea. The jury could consider such testimony as support for defendant's claim that he was persuaded to make false statements during his interviews with authorities.

### 2. *The proffered testimony of Deputy District Attorney Mitchell*

Defendant also requested he be allowed to call the prosecutor to testify at the penalty phase of trial, contending Deputy District Attorney Mitchell was a necessary percipient witness to defendant's interrogation, that Mitchell was the person who first told defendant any prior encounter with Melissa was "water under the bridge," and that Mitchell retained Dr. Rath to extract a confession from defendant. The trial court denied the request.

As with the testimony of Dr. Leo, the trial court did not abuse its discretion in denying defendant's request to call Mitchell as a witness. As we explained in rejecting defendant's guilt phase argument (*ante*, pt. II.B.2.b., pp. 46-48), Mitchell's proposed testimony was either irrelevant or cumulative to other admitted evidence. The other evidence was available for the jury's consideration at the penalty phase.

### 3. *The proffered testimony of Dr. Whiting*

Defendant requested permission to call Dr. Whiting to testify concerning defendant's psychological characteristics and how those correlated to the facts of the crimes. Defendant contemplated that Whiting would express an opinion that defendant was suffering a panic attack when he encountered Melissa and that he

65

lacked the specific intent to rape, molest, or steal.  Defendant wanted Whiting to be able to use as a basis for such opinion his 1997 interviews with defendant.  The prosecution objected that this would allow the introduction of defendant's self-serving hearsay statements in the guise of an explanation of the basis for Whiting's expert opinion.  The trial court agreed that it would be inappropriate for Whiting to testify to defendant's hearsay statements.  The court ruled Whiting could testify, but with the same limitations it had imposed in the guilt phase, that is, Whiting could support his expert opinions with evidence already in the record and the results of his tests, but not rely on anything defendant said to him during interviews.  Ultimately, the defense did not call Whiting to testify during the penalty phase.

We conclude the trial court properly applied settled principles in restricting the testimony of Dr. Whiting.  As we have explained, "[w]hen expert opinion is offered, much must be left to the trial court's discretion.  [Citation.]  'An expert may generally base his opinion on any "matter" known to him, including hearsay not otherwise admissible, which may "reasonably . . . be relied upon" for that purpose.  [Citations.]  On direct examination, the expert may explain the reasons for his opinions, including the matters he considered in forming them.  However, prejudice may arise if, " 'under the guise of reasons,' " the expert's detailed explanation " '[brings] before the jury incompetent hearsay evidence.' " [Citation.]'  [Citation.]  '. . . Evidence Code section 352 authorizes the court to exclude from an expert's testimony any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value.  [Citation.]'  [Citation.]  The discretion to exclude hearsay applies to defense, as well as prosecution, expert evidence." (*People v. Carpenter* (1997) 15 Cal.4th 312, 403; accord, *People v. Whitt* (1990) 51 Cal.3d 620, 644.)  The discretion to

exclude incompetent hearsay applies to evidence proffered on the issue of lingering doubt. (*People v. Blair* (2005) 36 Cal.4th 686, 750.)

Here defendant's hearsay statements to Dr. Whiting were "made under circumstances" indicating a "lack of trustworthiness." (Evid. Code, § 1252.) Defendant's interviews with Whiting occurred three years after Melissa's death while his capital trial was pending. There was a clear incentive at that time for defendant to minimize his culpability in his statements. Under these circumstances, the trial court appropriately ruled Whiting could not rely on defendant's statements if Whiting testified. This did not preclude defendant from presenting his theory that he may have been suffering a panic attack at the time of the murder. At the penalty phase, the jury was allowed to consider Whiting's testimony at the guilt phase of trial that defendant was likely suffering such an attack. Defendant could have called Whiting to testify at the penalty phase if he felt that further explanation would be helpful.

## B. The trial court's exclusion of asserted evidence of third party culpability

Defendant contends the trial court unconstitutionally deprived him of due process, a fair trial, and the right to present a defense when it denied his request to present third party culpability evidence of a late-night home intrusion that occurred in defendant's neighborhood three years prior to defendant's crimes against Melissa. Although defendant initially phrases his argument in terms applicable to the exclusion of guilt phase evidence, we understand defendant's claim, consistent with later statements in his briefs, to be that the exclusion of this evidence at the penalty phase violated his right to present mitigating evidence. (See generally *Kansas v. Marsh* (2006) 548 U.S. 163, 174; *Skipper v. South Carolina* (1986) 476 U.S. 1, 4.)

67

*1. Background*

Defendant sought permission at the penalty phase of trial to introduce the testimony of his neighbor, Bettie Mercado, that she encountered an underwear-clad male, who was between 25 and 30 years old, in the hallway of her home late one night about three years before the crimes against Melissa.

At a hearing outside the presence of the jury, Mercado testified that she lived around the corner from the Lintons and that one night in late 1991 she heard her two young children talking. When she got up and walked down the hallway to investigate, she met a male intruder. She knew defendant and was sure the intruder was not defendant. The intruder ran back to Mercado's son's room and grabbed his clothes. Mercado's husband chased the intruder from their home. Mercado checked on her children and then dialed 911.

The prosecution objected that the proposed testimony was irrelevant. Defendant countered that the evidence of another nighttime intruder in the neighborhood who was wearing only his underwear was sufficient to raise a doubt about who Melissa saw, if she saw anyone, in the prior assault. The trial court sustained the objection.

*2. Discussion*

Defendant argues the trial court erred because the Mercado incident was similar to the prior assault described by Melissa's parents, making it relevant to the issue of lingering doubt at the penalty phase of defendant's trial. We disagree.

"Only relevant evidence is admissible. (Evid. Code, § 350.) Evidence that raises a reasonable doubt as to a defendant's guilt, including evidence tending to show that another person committed the crime, is relevant. But evidence that another person had a motive or opportunity to commit the crime, without more, is irrelevant because it does not raise a reasonable doubt about a defendant's guilt; to be relevant, the evidence must link this third person to the actual commission of

68

the crime.  [Citation.]  Evidence that is relevant still may be excluded if it creates a substantial danger of prejudicing, confusing, or misleading the jury, or would consume an undue amount of time.  (See Evid. Code, § 352.)"  (*People v. Brady* (2010) 50 Cal.4th 547, 558; accord, *People v. Hamilton, supra,* 45 Cal.4th at pp. 913-914; *People v. Geier* (2007) 41 Cal.4th 555, 581-582.)  "Evidence that is inadmissible to raise reasonable doubt at the guilt phase is inadmissible to raise lingering doubt at the penalty phase."  (*People v. Stitely*, *supra,* 35 Cal.4th at p. 566; see *People v. Hamilton, supra,* at pp. 913-914.)

Applying these principles, it is clear that the trial court did not err in excluding the proffered testimony of Mercado.  Nothing was offered that connected the unidentified nighttime intruder into the Mercados' home years earlier with the first assault on Melissa.  Given the substantial length of time between the incidents, the fact that they shared some relatively generic similarities (both involved males in some state of undress — one was partially clad, the other was nude, and both occurred at night) did not suffice to link the two incidents.  Moreover, to the extent the Mercado incident had any probative value at all, it was certainly substantially outweighed by the risk of confusing or misleading the jury.  (Evid. Code, § 352.)

Because there was no error under state law, we reject defendant's constitutional claims.  " '[A]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [state or federal constitutional] right to present a defense.'  [Citations.]"  (*People v. Robinson* (2005) 37 Cal.4th 592, 626-627, quoting *People v. Hall* (1986) 41 Cal.3d 826, 834; see also *Holmes v. South Carolina* (2006) 547 U.S. 319, 326-327 [although the federal Constitution prohibits exclusion of defense evidence under state rules that serve no legitimate purpose or that are disproportionate to the ends they are asserted to promote, application of well-established rules of evidence is permissible].)

### C. The admission of photographs and testimony as victim impact evidence

Prior to trial, defendant moved for a ruling on the admissibility of the prosecution's proposed victim impact evidence, which consisted of testimony by Melissa's parents and several of her friends, plus a seven- or eight-minute video montage of 53 still photographs accompanied by music. After viewing the video, the trial court ruled the evidence was admissible. Prior to the penalty phase, however, the prosecution decided not to introduce the video. Instead, it presented the testimony of Melissa's parents and two of her school friends, and 13 still photographs depicting Melissa on various occasions of her life, the memorial plaque at her school, and the empty chair at graduation.

Defendant tendered a continuing objection to the victim impact evidence during the examination of Melissa's father. After Melissa's father finished testifying, defendant complained that during the earlier testimony of Melissa's mother, two jurors had cried, two other jurors had wiped their eyes, and another juror was visibly upset. Defendant argued the testimony exceeded the bounds of appropriate victim impact evidence. The trial court overruled defendant's objection as well as his subsequent motion to strike the testimony of Melissa's parents. The trial court also overruled defendant's continuing objection to all of the photographic evidence.

Defendant claims on appeal that the "gut-wrenching" victim impact evidence introduced in this case was so "voluminous, inflammatory and unduly prejudicial" as to constitute a deprivation of his right to due process, a fair trial and the right to present a defense under the federal and state Constitutions. We find no error.

As defendant recognizes, victim impact evidence, including photographic images of the victim while he or she was alive, may be introduced at penalty phase

70

proceedings under the federal Constitution (*Payne v. Tennessee* (1991) 501 U.S. 808) and under our state law. (*People v. Russell* (2010) 50 Cal.4th 1228, 1264-1265; *People v. Dykes, supra,* 46 Cal.4th at p. 781.) "[T]he state has a legitimate interest in ' "counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to [her] family." ' " (*People v. Garcia* (2011) 52 Cal.4th 706, 751, quoting *Payne v. Tennessee, supra,* 501 U.S. at p. 825; accord, *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1056.) "Unless it invites a purely irrational response, evidence of the effect of a capital murder on the loved ones of the victim is relevant and admissible under section 190.3, factor (a), as a circumstance of the crime. [Citation.] The federal Constitution bars victim impact evidence only if it is so unduly prejudicial as to render the trial fundamentally unfair. [Citations.]" (*People v. Booker* (2011) 51 Cal.4th 141, 190; *People v. Zamudio* (2008) 43 Cal.4th 327, 364.)

The evidence presented by the prosecution here was not excessive — the testimony of Melissa's mother occupies 18 pages of transcript, the testimony of her father occupies 13 pages, the testimony of Melissa's friend Jessica H. takes up five pages, and the testimony of Melissa's friend Lindsay B. covers just four pages. (*People v. Dykes, supra,* 46 Cal.4th at pp. 782-783.) Nor did the evidence go beyond the permissible scope of victim impact testimony. As mentioned earlier, the testimony described Melissa as a kind, loving, cheerful, and friendly person with multiple interests and talents, who was missed deeply by her parents and friends. She was mourned by them and her school community. Her parents described the continuing impact her death has on them and other members of their family. Melissa's father described the guilt he felt over his failure to protect Melissa and take seriously her report of the prior assault. (*People v. McKinnon*

71

(2011) 52 Cal.4th 610, 690-691.) The prosecution introduced 13 still photographs of Melissa, showing her at various ages and on various occasions. (See *People v. Zamudio, supra,* 43 Cal.4th at pp. 363-368 [video montage containing 118 photos admissible]; *People v. Edwards* (1991) 54 Cal.3d 787, 832-836 [photos of victim while alive admissible].)

Like the evidence admitted in *People v. Huggins* (2006) 38 Cal.4th 175, this "testimony, though emotional at times, fell far short of anything that might implicate the Eighth Amendment. It was traditional victim-impact evidence, 'permissible under California law as relevant to the circumstances of the crime, a statutory capital sentencing factor.' " (*Id.* at p. 239; accord, *People v. Zamudio, supra,* 43 Cal.4th at pp. 364-368.) That some jurors may have reacted to the testimony by crying does not require a conclusion that the evidence invited a purely irrational response by the jury in deciding the appropriate penalty or otherwise rendered defendant's trial fundamentally unfair. (See *People v. Booker, supra,* 51 Cal.4th at p. 192; *People v. Jurado* (2006) 38 Cal.4th 72, 132-134.) Having reviewed the transcript, the photos, and the relatively minor role such evidence played in the prosecution's penalty phase argument, which emphasized the circumstances of defendant's crimes and urged the jury to decide the appropriate penalty based on reason and not emotion, we reject defendant's claim of constitutional error.

**D.  Defendant's claims of prosecutorial misconduct in closing argument**

Defendant contends the prosecutor committed multiple acts of prejudicial misconduct in closing argument during the penalty phase, requiring reversal. Defendant failed to preserve his right to challenge much of the alleged misconduct and in any event his claims are meritless.

## 1. The applicable law

" 'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.'  [Citation.]  When a claim of misconduct is based on the prosecutor's comments before the jury, as all of defendant's claims are, ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." '  [Citations.]  To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument.  [Citation.]" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305.)  A failure to timely object and request an admonition will be excused if doing either would have been futile, or if an admonition would not have cured the harm.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1201.)

## 2. Denigrating defense counsel

Defendant complains on appeal that various comments of the prosecutor in his final closing argument disparaged defense counsel.

Defendant points to the prosecutor's statements that "[d]efense counsel will belittle the facts, accuse me of speculation.  I didn't create this evidence . . ." and that "[t]he defense, in the People's position, has exaggerated the abuse the defendant has suffered in his childhood . . . ."  Defendant also cites to the prosecutor's argument that "[t]he defense in this case has been designed to desensitize you to the crimes that the defendant committed.  I want you to recognize, if you have not already, the language of manipulation.  Her murder is

73

referred to as a tragedy. It's not a tragedy, it's a murder. It's repeatedly said that Melissa died. Melissa didn't die, she was killed. . . . The defense has attempted to present evidence of his entire childhood to you, especially at the ages of five and eight, to attempt to humanize him, to divert attention away from the crime he committed and the reason why he's here. [¶] And perhaps the most glaring example of a technique used to divert attention away from the defendant, who is the focus of these proceedings, is to paint other people, other persons, as the bad guy, as the bad guy. It's been the big bad D.A. in this case who's overfiled it, who's overcharged it, who's made or tried to make it look, according to the defense, as if the defendant did more than he actually did, committed more crimes than he actually did. [¶] And [defense counsel] gets up here and tried to analogize the charges in this case to a [jail] disciplinary marker. . . ."

In a similar vein, defendant claims misconduct in several other comments by the prosecutor that accused the defense of belittling the charges, the evidence, and the crimes, with the purpose of creating a diversion and presenting an argument for a more lenient sentence. Defendant complains about the prosecutor's argument that: "Particularly appalling is the audacity of defense counsel in calling or evoking Melissa's Middleton's name in an attempt to make a plea for the lesser sentence in this case. Not only appalling, it was offensive."[10]

Defendant failed to object and request an admonition regarding these comments. Nothing suggests an objection and request for admonition would have been futile, given that defense counsel made other objections, some of which the

---

[10] Defense counsel had earlier argued Melissa was not the kind of person who would want the jury to kill defendant, her friend's brother, "for his mistake," referring to testimony that she was the type of person who brought an injured wasp home to recover.

74

trial court sustained. We conclude, therefore, that defendant forfeited his challenge to these comments.

In any event, defendant's claim that the cited argument constituted misconduct lacks merit. The prosecutor's comments responded directly either to earlier arguments made by defense counsel or defense arguments the prosecutor reasonably anticipated being made based on prior defense arguments. When the comments are considered in context, there is no likelihood that the jury would have understood the comments as anything beyond criticism of defense counsel's tactical approach in argument and the defense view of the evidence in the case, as is allowed. (*People v. Huggins, supra,* 38 Cal.4th at p. 207; *People v. Cole, supra,* 33 Cal.4th at p. 1203.) The comments did not constitute an improper argument or an attack on counsel's personal integrity. (*People v. Chatman* (2006) 38 Cal.4th 344, 387; *People v. Medina* (1995) 11 Cal.4th 694, 758-759.)

### 3. *Improper vouching*

Defendant contends a portion of the above quoted argument also constituted prosecutorial misconduct as impermissible "vouching." Specifically defendant points to the comments by the prosecutor that defense counsel was trying to divert attention away from defendant by trying to paint other people, including the prosecutor, as the "bad guy" who was trying to make it seem as if defendant committed more crimes than he actually did. Defendant claims this argument implied the prosecutor "is the 'good guy' who has evidence that the jury does not know about and that the jury should trust him, as the public prosecutor, to be doing the right thing."

The claim is forfeited for failure to object at trial. The claim also lacks merit. Impermissible vouching occurs when "prosecutors [seek] to bolster their case 'by invoking their personal prestige, reputation, or depth of experience, or the

prestige or reputation of their office, in support of it.' [Citation.] Similarly, it is misconduct 'to suggest that evidence available to the government, but not before the jury, corroborates the testimony of a witness.' " (*People v. Bonilla* (2007) 41 Cal.4th 313, 336; *People v. Zambrano* (2007) 41 Cal.4th 1082, 1167.) The prosecutor's argument did neither of these things. In urging the jury not to be distracted by defense counsel's tactic of blaming others for the seriousness of the situation defendant faced, a strategy of making other people "the bad guy," the prosecutor was referencing defense counsel's oft-repeated contention that defendant was coerced by authorities, at the instigation of the prosecutor, into making false admissions and a false confession of sexual interest in and conduct with Melissa. The prosecutor was criticizing this denial of culpability and minimization of the crimes. The prosecutor was not suggesting there was evidence the prosecutor knew outside of the record or that the jury should personally trust him because of his position.

### 4. *Argument of facts not in evidence*

Defendant contends the prosecutor committed prejudicial misconduct during his closing argument by referring to facts not in evidence. " '[S]tatements of facts not in evidence by the prosecuting attorney in his argument to the jury constitute misconduct.' [Citations.]" (*People v. Bolton* (1979) 23 Cal.3d 208, 212; accord, *People v. Smith* (2003) 30 Cal.4th 581, 617.) But we find no such misconduct here.

### a. *Defendant's masturbation on Melissa's underwear after the murder*

Twice during his argument, the prosecutor argued that defendant took Melissa's underpants and masturbated into them after he killed her. Defendant objected that there was no evidence of that "whatsoever." The trial court ruled that the prosecutor was discussing a reasonable interpretation of the evidence and

76

that it was up to the jury to determine whether the prosecutor's interpretation was reasonable.

We agree with the trial court. A pair of Melissa's underpants stained with defendant's semen was found in the trash at the Linton's home the day after Melissa's murder. The underpants were found with a ring belonging to Melissa and with the keys to the Middleton home that defendant said he threw out after the murder. Although there was no specific evidence indicating when defendant had masturbated on the underpants and defendant could have done so before the murder, it was within the range of reasonable inferences to suggest defendant had done so after the murder because he threw out the underpants, the ring and the keys together.

### b. Defendant's remorse

The prosecutor argued that "[n]othing [defendant] did the next day, November 30, 1994, when the officer came to pick him up at his house to talk to him some more, nothing he did that day can erase or mitigate what he had done to Melissa and to her family the prior day. When you're looking for any sign of remorse that is important as a mitigating factor in this case, look at his actions on the day that it counts, on the day that it matters, on the day when one would be revolted." The trial court overruled defense counsel's objection based on the Sixth Amendment to the federal Constitution and the lack of opportunity to cross-examine "this witness." The prosecutor continued: "The day where one would be revolted by one's conduct if one had in him that human feeling, natural emotion, not the mentality of a killer. That's when it counts. Not after police suspicion has focused on you, not after they have been asking probing questions about a prior incident, not after they've noticed scratches on your arm, and not after they've asked you to come down to the police station to talk further about the case. It

wasn't until the next day that [defendant] ever expresses any sorrow or grief."
The trial court again overruled defense counsel's objection based on defendant's
Sixth Amendment right to confrontation.

On appeal, defendant complains this argument improperly referenced facts
outside the evidence. We reject the claim. The prosecutor's argument questioned
the sincerity of defendant's expression of any remorse by arguing defendant
expressed remorse only when it became obvious that the authorities suspected him
of being Melissa's killer. For this purpose, the prosecutor asked the jury to look at
defendant's actions on the day of the murder to consider whether defendant
demonstrated any immediate remorse. The prosecutor forcefully argued defendant
did not express any sorrow or grief until the next day, but nothing in the
prosecutor's statements suggested the prosecutor was basing his argument on his
personal knowledge of facts outside the record, i.e., that he was in effect speaking
as a "witness." There was no reasonable likelihood the jury construed the remarks
as anything more than an argument that if the jury reviewed the evidence before it,
it would conclude defendant had not expressed any remorse until the day after the
murder when suspicion had focused on him and the authorities were bringing him
in for official questioning. In making his argument, the prosecutor argued
permissible inferences from the evidence. Defendant argued against such
inferences in rebuttal, as he was entitled to do. It was up to the jury to determine
the reasonableness of the inferences urged. (*People v. Smith, supra,* 30 Cal.4th at
p. 617.)

> ### c. Conditions in prison if defendant were sentenced to life without parole

The prosecutor argued that life without the possibility of parole was not an
appropriate punishment in this case. The prosecutor stated: "I suggest to you it's
not enough in this case. The defendant will have a life, if you let him have life

78

without parole. He will have a community of people that he deals with. He will have his friends. He will have money to buy things. He will have television. He will have books. He will have visits from his family." The trial court overruled defendant's objection that there was no evidence to support this argument.

Although there was some testimony from members of defendant's family regarding their contact with defendant in person and by telephone while he was in jail and their sending of money to him, which defendant used to purchase things for his fellow inmates, defendant is correct that there was no evidence of the conditions defendant would live in if he was sentenced to state prison for a life term without the possibility of parole. However, even assuming the trial court should have sustained defendant's objection on such basis (see *People v. Redd* (2010) 48 Cal.4th 691, 753), we conclude that there is no reasonable possibility the jury would have reached a more favorable verdict in the absence of this argument. The comments were brief and minor in the context of the argument as a whole. The prosecutor acknowledged that life in prison without the possibility of parole is a "severe, severe punishment," "a hard and severe punishment" and the defense countered the prosecutor's argument with its own argument regarding the conditions defendant would face in prison.

### 5. *Appeal to public passion and sentiment*

The prosecutor argued "that a death verdict, ladies and gentlemen, is the ultimate validation of what we hold and value most dear in our community and as individuals: Our life, our children, and the sanctity of our home. And if you were to find that death is the appropriate sentence for [defendant], you are doing no more than affirming in the loudest voice possible those values in our community." The trial court sustained defendant's objection that these comments improperly argued community and public sentiment. The prosecutor then stated: "A death

verdict is the ultimate validation of our community values. Let the punishment fit the crime. A death verdict says we will not tolerate this type of crime." The trial court overruled defendant's objection, stating that it did not think the prosecutor "stepped over the line at that point."

Defendant now contends the prosecutor's argument constituted an improper appeal to the jury's passion or prejudice. (*People v. Pitts* (1990) 223 Cal.App.3d 606, 694, 702.)

"It is, of course, improper to make arguments to the jury that give it the impression that 'emotion may reign over reason,' and to present 'irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response.' [Citation.]" (*People v. Padilla* (1995) 11 Cal.4th 891, 956-957, overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.) However, defendant did not object to the prosecutor's statements on this basis, and therefore has forfeited this claim. (*People v. Redd, supra,* 48 Cal.4th at pp. 742-743.) And to the extent defendant's argument encompasses the objection he made at trial, we conclude the brief comment ultimately allowed by the trial court fell within the bounds of permissible argument we have recognized. (*People v. Zambrano, supra,* 41 Cal.4th at pp. 1177-1179.)

### E. Instructing the jury pursuant to CALJIC No. 8.85

CALJIC No. 8.85 instructs the jury regarding the aggravating and mitigating factors listed in section 190.3, factors (a) through (k), which the jury must consider in deciding the penalty to be imposed on a capital defendant. Defendant claims the trial court erred by instructing the jury pursuant to CALJIC No. 8.85 without deleting the six factors that defendant contended were inapplicable to his case. Defendant also asserts the trial court erred by failing to

80

delete the modifier "extreme" from the description of a defendant's mental or emotional disturbance that the jury is to consider as a factor under factor (d) of CALJIC No. 8.85. We have repeatedly rejected both of these claims. (See, e.g., *People v. Thomas* (2011) 51 Cal.4th 449, 505; *McWhorter, supra,* 47 Cal.4th at pp. 378-379; *People v. Lindberg* (2008) 45 Cal.4th 1, 50-51.) Not being persuaded we should reconsider our prior decisions, we likewise reject defendant's claims.

### F. Instructing the jury with CALJIC No. 8.88

Defendant contends the penalty phase concluding instruction used at his trial, a slightly modified version of CALJIC No. 8.88,[11] violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution and the corresponding sections of the state Constitution. As defendant concedes, we have previously considered and rejected his arguments. We do so again because defendant fails to persuade us that our prior decisions were erroneous.

Accordingly, we conclude CALJIC No. 8.88 is not unconstitutional for failing to inform the jury that if the mitigating circumstances outweigh those in aggravation, it is required to return a sentence of life without the possibility of parole. (*People v. Lomax* (2010) 49 Cal.4th 530, 595; *People v. Lindberg, supra,* 45 Cal.4th at p. 52.) We once again reject the argument that our decision in *People v. Duncan* (1991) 53 Cal.3d 955, 978, erroneously concluded such an instruction was unnecessary. (*People v. Page* (2008) 44 Cal.4th 1, 57.)

---

[11]    The trial court modified CALJIC No. 8.88 to include an additional sentence instructing the jury that "[t]here is no need for you as jurors to unanimously agree to the presence of a mitigating or aggravating factor before considering it."

81

We conclude CALJIC No. 8.88 is not constitutionally defective for failing to inform the jury that it has the discretion to impose a sentence of life without the possibility of parole even in the absence of mitigating circumstances. (*People v. Lindberg, supra,* 45 Cal.4th at p. 52; *People v. Moon* (2005) 37 Cal.4th 1, 43.)

CALJIC No. 8.88's statement that jurors may impose a death sentence only if the aggravating factors are "so substantial" in comparison with the mitigating circumstances that death is warranted is not unconstitutionally vague. (*Carrington, supra,* 47 Cal.4th at p. 199; *People v. Page, supra,* 44 Cal.4th at pp. 55-56.)

CALJIC No. 8.88 is not constitutionally flawed because it "uses the term 'warrants' instead of 'appropriate.' " (*People v. Rogers* (2009) 46 Cal.4th 1136, 1179; *People v. Page, supra,* 44 Cal.4th at p. 56.)

## G. The trial court's inquiry into allegations of juror misconduct during penalty phase deliberations

Defendant claims the trial court deprived him of due process, a fair trial and the right to an unbiased and impartial jury when it failed to make further inquiries into possible juror misconduct during the jury's penalty phase deliberations. We agree with the trial court that no juror misconduct was shown and further find no abuse of discretion by the trial court in refusing to conduct further investigation.

### 1. Background

On the third day of penalty phase deliberations, the trial court received a note from the jury foreperson stating that the foreperson had received two emails from "individuals on the jury regarding the conduct of other jurors. (1) One juror was upset at another for saying they did not have compassion. (2) One juror was upset at another for saying they were having too much fun in the deliberation room, and not taking this case serious." The foreperson's note asked the court whether this was "appropriate" or "a problem."

82

At the time when the court was considering how to respond to the note, the jury sent another note indicating it had reached a verdict. The trial court agreed to question the foreperson about the initial note before receiving the verdict.

The jury foreperson was brought into the courtroom to respond to the inquiry of the court outside the presence of the other members of the jury. The foreperson told the trial judge that the two emails were directed to him and that he did not "see any cc's in the headers." Thus, to his knowledge, the emails were sent to him only. The foreperson said that both emails complained about comments, as described in the foreperson's note, which had been made during deliberations in front of all the jurors. According to the foreperson, it appeared to him that the sender of each email was offended by the comments and was basically venting to the foreperson. Apparently, the foreperson added, the individuals who sent the emails did not want to directly confront the jurors who made the statements. The foreperson knew who made the complained-of statements because the comments were made during deliberations. The foreperson could not determine, however, who sent the emails because the sender was not identifiable from the emails themselves and the statements were made to all the jurors, not to an individual. The foreperson told the court that he deleted the emails without responding. Further, the foreperson stated, he mentioned his receipt of the emails to the jury as a whole in deliberations that morning, but no one admitted sending the emails. None of the jurors made any follow-up comment regarding the content of the emails. According to the foreperson, one juror stated some concern and suggested that "we should let the court decide whether this was an appropriate act or not." Asked by the court whether they had any further questions for the jury foreperson, defense counsel and the prosecutor said "no."

After the foreperson left the courtroom, defense counsel argued to the trial court that the two emailing jurors violated the trial court's express instructions not

to deliberate outside the jury room and that those jurors should be identified. Defense counsel added that it was unknown what other notes and messages the jurors may have sent among themselves. Counsel expressed concern that an attempt was being made outside the jury room "to still [the] voice of a particular juror."

The trial court found that there was no jury misconduct, noting that all of the comments reflected in the emails occurred within the jury deliberation room and that a couple of jurors were simply venting to the foreperson about things that were said because "their feelings might have been hurt or something [to] that effect." The court found the emails did not amount to discussing the case or deliberating outside the jury room. The trial court declined to make any further inquiries, concluding it would be inappropriate to inquire whether the jurors had violated the court's admonitions without information suggesting that they may have done so. The trial court proceeded to receive the penalty verdict.

### 2. *Discussion*

Defendant argues the above described actions of the jurors and jury foreperson constituted misconduct because there was an "exchange" of emails "between themselves [that] clearly violated their oaths and the court's instructions." Defendant contends there was a strong possibility that the misconduct was prejudicial and hence separate questioning of the jurors was needed to resolve the conflict in the information provided by the foreperson. Defendant claims the trial court erred by not identifying the errant jurors and questioning them further.

" 'When a trial court is aware of *possible* juror misconduct, the court "must 'make whatever inquiry is reasonably necessary' " to resolve the matter.' [Citation.] Although courts should promptly investigate allegations of juror

84

misconduct 'to nip the problem in the bud' [citation], they have considerable discretion in determining how to conduct the investigation. 'The court's discretion in deciding whether to discharge a juror encompasses the discretion to decide what specific procedures to employ including whether to conduct a hearing or detailed inquiry.' [Citation.]" (*People v. Prieto* (2003) 30 Cal.4th 226, 274; accord, *People v. Virgil* (2011) 51 Cal.4th1210, 1284.)

Here the trial court chose, upon receipt of the note regarding the two emails, to directly question the recipient of the emails — the jury foreperson. Based on the information provided by the foreperson, the trial court properly found there was no misconduct. Contrary to defendant's characterization of the matter, the questioning of the jury foreperson did not reveal any "exchange" of emails between jurors. The foreperson alone merely received two emails, which complained to him about things said *during* deliberations. At most this was an attempt to have a conversation outside the deliberation room, but the foreperson did not reply and could not even identify the senders. The foreperson mentioned his receipt of the emails to the whole jury when deliberations continued. No one admitted sending the emails and there was no discussion of them. A concern regarding the appropriateness of sending the emails was expressed and the court's input was sought. The questioning conducted by the court, thus, uncovered no evidence of any discussion or deliberations, electronic or otherwise, occurring outside the presence of the entire jury that constituted misconduct. (See § 1122.)

We further conclude the trial court acted well within its considerable discretion in deciding that no further inquiry was necessary. (*People v. Virgil, supra,* 51 Cal.4th at p. 1284.) There was no conflict in the information provided by the foreperson. Nothing suggested other emails were being or were likely to be exchanged between jurors. Defense counsel's expressed concern that there might have been other notes and messages sent among the jurors was entirely

unsubstantiated.  Defendant is not entitled to conduct a " ' "fishing expedition" ' " for possible misconduct.  (*People v. Avila, supra,* 38 Cal.4th at p. 604.)

### H.  Challenges to California's death penalty scheme

Defendant raises a number of challenges to the constitutionality of California's death penalty scheme under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution.  We are not persuaded to reconsider the conclusions we have previously reached on such claims and reject them again as follows:

"Section 190.2 is not impermissibly overbroad in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. Specifically, the various special circumstances are not so numerous as to fail to perform the constitutionally required narrowing function, and the special circumstances are not unduly expansive, either on their face or as interpreted by this court.  [Citation.]  Nor did the 1978 death penalty law — enacted by the voters by way of initiative in November 1978 — have the intended or practical effect of making all murderers death eligible.  [Citation.]" (*People v. Jennings* (2010) 50 Cal.4th 616, 688 (*Jennings*).)

"Section 190.3, factor (a), does not, on its face or as interpreted and applied, permit arbitrary and capricious imposition of a sentence of death in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.  (E.g., *People v. Brasure* (2008) 42 Cal.4th 1037, 1066; see also *Tuilaepa v. California* (1994) 512 U.S. 967, 976 ['The circumstances of the crime are a traditional subject for consideration by the sentencer, and an instruction to consider the circumstances is neither vague nor otherwise improper under our Eighth Amendment jurisprudence.'].)  'Defendant's argument that a seemingly inconsistent range of circumstances can be culled from death penalty

86

decisions proves too much. What this reflects is that each case is judged on its facts, each defendant on the particulars of his offense. Contrary to defendant's position, a statutory scheme would violate constitutional limits if it did not allow such individualized assessment of the crimes but instead mandated death in specified circumstances.' (*People v. Brown* (2004) 33 Cal.4th 382, 401 (*Brown*).)" (*Jennings, supra,* 50 Cal.4th at pp. 688-689.)

"Neither the federal nor the state Constitution requires that the penalty phase jury make *unanimous* findings concerning the particular aggravating circumstances, find all aggravating factors *beyond a reasonable doubt*, or find beyond a reasonable doubt that the aggravating factors *outweigh* the mitigating factors. (E.g., [*People v.*] *Fairbank* [(1997) 16 Cal.4th [1223,] 1255.) The United States Supreme Court's recent decisions interpreting the Sixth Amendment's jury-trial guarantee (see *Cunningham v. California* (2007) 549 U.S. 270; *United States v. Booker* (2005) 543 U.S. 220; *Blakely v. Washington* (2004) 542 U.S. 296; *Ring v. Arizona* (2002) 536 U.S. 584; *Apprendi* [*v. New Jersey* (2000)] 530 U.S. 466) do not alter these conclusions. (E.g., *People v. Bramit* (2009) 46 Cal.4th 1221, 1249 & fn. 22.)" (*Jennings, supra,* 50 Cal.4th at p. 689; accord, *People v. Castaneda* (2011) 51 Cal.4th 1292, 1355.)

Neither the cruel and unusual punishment clause of the Eighth Amendment, nor the due process clause of the Fourteenth Amendment, requires that jurors in a capital case be instructed that they must find beyond a reasonable doubt that aggravating circumstances exist or that aggravating circumstances outweigh mitigating circumstances or that death is the appropriate penalty. (*People v. D'Arcy* (2010) 48 Cal.4th 257, 300; *People v. Blair, supra,* 36 Cal.4th at p. 753.) Indeed, trial courts "should not instruct the jury regarding any burden of proof or persuasion at the penalty phase." (*People v. Lee, supra,* 51 Cal.4th at p. 655.) " 'Unlike the guilt determination, "the sentencing function is inherently moral and

87

normative, not factual" [citation] and, hence, not susceptible to a burden-of-proof quantification.' " (*People v. Avila* (2009) 46 Cal.4th 680, 724, quoting *People v. Hawthorne* (1992) 4 Cal.4th 43, 79.)

The lack of written or other specific findings by the jury regarding aggravating factors did not deprive defendant of his federal due process and Eighth Amendment rights to meaningful appellate review, violate equal protection of the laws or violate defendant's Sixth Amendment right to trial by jury. (*People v. Romero* (2008) 44 Cal.4th 386, 428-429; *People v. Parson* (2008) 44 Cal.4th 332, 370.)

"Review for intercase proportionality is not constitutionally required. [Citations.] Defendant fails to support his assertion that this court has categorically forbidden such review; in the only case to which he refers, we considered the showing of alleged disproportionality and found it insufficient. [Citation.]" (*People v. Harris* (2008) 43 Cal.4th 1269, 1322-1323; accord, *People v. Romero, supra,* 44 Cal.4th at p. 429.)

"Section 190.3, factor (b) does not violate the federal Constitution by permitting the use of unadjudicated criminal activity as an aggravating factor, nor must such factors be found true beyond a reasonable doubt by a unanimous jury. [Citations.]" (*People v. Harris, supra,* 43 Cal.4th at p. 1323.)[12]

The use of the words " 'extreme' " in section 190.3, factors (d) and (g), and " 'substantial' " in factor (g), does not act as a barrier to the consideration of

---

[12] The prosecutor did not rely on any unadjudicated criminal conduct by defendant as an aggravating circumstance. It was undisputed that defendant had no prior criminal background. Assuming without deciding that defendant's claim could have an impact on this case, we consider and repeat our previous rejection of the claim.

mitigating evidence in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. (*Jennings, supra,* 50 Cal.4th at p. 690.)

We continue to conclude there is no constitutional error in failing to instruct the jury that statutory mitigating factors were relevant only in mitigation and that the instruction to the jury to consider "whether or not" certain mitigating factors were present did not invite the jury to improperly aggravate the sentence upon the basis of nonexistent or irrational aggravating factors in violation of both state law and the Eighth and Fourteenth Amendments. (*People v. Parson, supra,* 44 Cal.4th at p. 369.)

"California's capital sentencing procedures do not violate principles of equal protection of the law on the ground they provide safeguards different from those found in noncapital cases." (*People v. Williams, supra,* 43 Cal.4th at p. 650.)

California's use of the death penalty is not unconstitutional on the ground that it assertedly violates international norms of humanity and decency. (*People v. Romero, supra,* 44 Cal.4th at pp. 428-429; *People v. Williams, supra,* 43 Cal.4th at p. 650.)

## I. Cumulative penalty phase error

Defendant contends the cumulative effect of the asserted errors committed by the trial court at the penalty phase requires reversal. We have identified only one possible error — the trial court's failure to sustain defendant's objection to the prosecutor's closing argument comments concerning the prison conditions an inmate sentenced to a life term without the possibility of parole would experience — and have found such error harmless. There is no cumulative effect of errors to consider. Reversal is not required.

## IV. CONCLUSION

The judgment is affirmed.

CANTIL-SAKAUYE, C. J.

WE CONCUR:

KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Linton
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S080054
**Date Filed:** June 27, 2013
_____

**Court:** Superior
**County:** Riverside
**Judge:** Gordon R. Burkhart
_____

**Counsel:**

Diane E. Berley, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Anne Featherman Fraser and Lise S. Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Diane E. Berley
6520 Platt Avenue, PMB 834
West Hills, CA  91307-3218
(818) 716-6504

Lise S. Jacobson
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2293